**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 2017-cv 2432

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAN MIGUEL,
COLORADO ; ROCKY MOUNTAIN WILD; SAN JUAN CITIZENS ALLIANCE;
CONSERVATION COLORADO

       Plaintiffs,

       v.

UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF
THE INTERIOR

       Defendants.

---

**COMPLAINT
(CITIZEN SUIT BROUGHT PURSUANT TO ENDANGERED SPECIES ACT; REVIEW
AND RELIEF ALSO SOUGHT UNDER ADMINISTRATIVE PROCEDURE ACT)**

---

**INTRODUCTION**

1.     By this lawsuit, the Board of County Commissioners of the County of San Miguel,

Colorado ("SAN MIGUEL COUNTY"), Rocky Mountain Wild, San Juan Citizens Alliance, and

Conservation Colorado ("Plaintiffs") seek judicial review and remedy for an oil and gas leasing

decision made by Defendants, the United States Bureau of Land Management and the United States

Department of the Interior (collectively "BLM").

2.     Plaintiffs' claims are based on the BLM's failure to fulfill its public disclosure and

informed decision making duties under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et

seq. ("NEPA"), failure to consult with the United States Fish and Wildlife Service pursuant to the

Endangered Species Act, 16 U.S.C. §§ 1531 et seq. ("ESA") and failure to adhere to the procedural

and substantive requirements of the Federal Lands Policy and Management Act, 43 U.S.C. §§ 1701 et

seq. ("FLPMA").   The ESA citizen suit provision (16 U.S.C. § 1540(g)) is not subject to the Local

Rules applicable to the NEPA and FLMPA claims. D.C.COLO.LAPR 1.1.

3.      This suit seeks to invalidate and set aside Defendants' decision to lease 9 parcels in the

March 2017 Colorado Lease Sale.[1]  Leasing these parcels constitutes an irreversible and irretrievable

commitment of resources. The impacts and alternative means to minimize and eliminate impacts of

this leasing were not adequately analyzed or disclosed to the public or the agency decisionmakers.

The leases do not contain conditions of approval allowing termination or modification of leases that

may cause take of threatened or endangered species.  Most concerning to Plaintiffs are the negative

impacts this leasing decision will have on the federally listed Gunnison sage-grouse ("GUSG") and

proposed and existing Areas of Critical Environmental Concern ("ACEC").

4.      Defendants supported this leasing decision by relying on stale analysis that failed to

consider or account for new scientific information, changed conditions, and other relevant factors.

These failures render the March 2017 leasing decision arbitrary, capricious, an abuse of discretion,

not in accordance with law, and without observance of procedure required by law. 5 U.S.C. § 706.

5.      This map presents an accurate representation of the location of the lease parcels in

relationship to the Gunnison sage-grouse habitat and the proposed Dry Creek ACECs:

---

[1] This lease sale was originally scheduled for February 2017.  BLM delayed the lease sale until
March 2017.



## JURISDICTION AND VENUE

6.     The issuance of a federal Mineral Leasing Act ("MLA") lease is a final agency action subject to immediate judicial review.  BLM leases are justiciable when issued.

7.     Plaintiffs filed a Protest to this lease sale on December 12, 2016.  Plaintiffs filed this timely lawsuit within the statute of limitations. This lawsuit alleges, among other things, that the Determination of NEPA Adequacy ("DNA") issued to support the leasing decision erroneously concluded that BLM had fulfilled its NEPA duties before taking action to lease federally owned minerals to private parties.

8.     BLM's issuance of each lease represents an irreversible and irretrievable commitment of public resources for private use.  BLM implements its oil and gas leasing program through a three-tiered NEPA process: 1) land management plans; 2) decisions to issue leases; 3) decisions to approve exploration or drilling proposals.  Each tier of the BLM decisionmaking process requires NEPA disclosure and analysis.

9.     The BLM oil and gas leases require lessees to exercise reasonable diligence in such things as developing, producing, and preventing unnecessary damage to, loss of, or waste of leased federal oil and gas mineral resources.

10.     The BLM oil and gas leases create a privately held lease interest in the public lands that prevents BLM from later prohibiting the lessee from surface use of the leased parcel.  BLM issued leases that do not protect important non-mineral resources or interests in public land with limiting terms.  BLM issued leases that do not protect important resources or interests in public land with limiting conditions of approval.  BLM issued leases without conditions of approval that allow BLM to terminate or modify leases to prevent activities that cause prohibited take of threatened or endangered species.

11.     BLM issued these leases without benefit of NEPA procedures required by law that inform its consideration of additional terms and conditions. The DNA BLM issued is not a NEPA document that can fulfill BLM's NEPA duties at the leasing tier of its oil and gas decisionmaking process.  BLM's failure to follow procedures required by law excluded disclosure and consideration of reasonable alternatives such as no surface occupancy, timing restrictions, travel bans and restrictions, Gunnison sage-grouse mitigation, and a limited lease issuance alternative.

12.     Lease-wide no surface occupancy conditions cannot be imposed at the Application for Permit to Drill ("APD") tier of the NEPA analysis.  Lease-wide travel bans and restrictions cannot be imposed at the APD stage.  Lease-wide Gunnison sage-grouse mitigation cannot be imposed at the APD stage.  Leases cannot be rescinded due to impacts identified at the APD stage.  The leases do not contain conditions of approval confirming BLM's statutory power to terminate leases if site-specific proposals are likely to take listed species.  The lease terms do not confirm BLM's statutory power to deny or require alterations to APDs that are likely to take ESA-listed species.  BLM believes it cannot deny or require alterations to APDs that are likely to take ESA-listed species.

13.     BLM believes it cannot terminate these leases based on environmental conditions identified at the APD stage.  BLM believes it cannot alter these leases based on environmental conditions identified at the APD stage.  The lessees believe BLM cannot terminate these leases based on environmental conditions identified at the APD stage.  The lessees believes BLM cannot alter these leases based on environmental conditions identified at the APD stage.

14.     BLM retains some control over the leased resources.  BLM's leasing decision irretrievably surrendered some control over the public lands.  BLM's leasing decisions cannot be revoked at the APD stage.

15.     The claims herein are ripe and can be effectively redressed by judicial relief that requires Defendants to correct NEPA, ESA, or other decisionmaking inadequacies at the leasing stage.  The claims herein can be redressed without requiring the federal government or Plaintiffs to commit resources necessary to consider or approve an APD for any lease.

16.     The ESA requires invalidation of leases that "may effect" Gunnison sage-grouse that BLM issued without first complying with ESA duties.  BLM did not consult with the Fish and Wildlife Service ("FWS") for leasing decisions that "may effect" Gunnison sage-grouse.  Delaying consideration of the present claims would force Plaintiffs, BLM, and FWS to go through the site-specific APD tier of the approval process before the foreseeable and known procedural and substantive problems with the mineral lease tracts have been resolved.

17.     This Court has jurisdiction to review agency actions and provide remedy pursuant to 28 U.S.C. §§ 1331 (federal question); 1346 (U.S. as defendant); 1361 (Mandamus); 2201 (declaratory relief); 2202 (injunctive relief); and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

18.     An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 & 706.  Each challenged agency action is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.  Sixty day notice of claims arising under the Endangered Species Act was provided to Defendants pursuant to 16 U.S.C. § 1540(g)(2)(A)(i) on May 22, 2017.  Defendants made no effort to address the claims set out in the notice.

19.     Venue is properly vested in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(B), 16 U.S.C. § 1540(g)(3)(A). The leased parcels are in San Miguel County, Colorado, and on federal land managed by the BLM Tres Rios Field Office. The agency actions challenged in

this suit occurred in Colorado.  Plaintiffs' organizations are incorporated and headquartered in Colorado, and many of Plaintiffs' members reside within Colorado.

## PARTIES

20.    Plaintiff SAN MIGUEL COUNTY is a body corporate and politic and a political subdivision of the State of Colorado having those powers conferred upon it under the constitution and laws of the State of Colorado.

21.    Plaintiff ROCKY MOUNTAIN WILD is a Colorado non-profit organization with its mailing address at 1536 Wynkoop St., Suite #900, Denver, CO 80202. Rocky Mountain Wild was created by the merger of two of Colorado's trusted and effective conservation organizations, Center for Native Ecosystems and Colorado Wild. Recognizing the need to stem dramatic losses of native species and habitat, these  Corganizations joined forces to protect, connect and restore wildlife and wild lands throughout the Southern Rocky Mountain region of Colorado, southern Wyoming, eastern Utah, and northern New Mexico. Rocky Mountain Wild, and its predecessor organizations, regularly review projects proposed on, or affecting, BLM lands that might adversely affect wildlife, water quality, air quality, and other resources; comment extensively on proposed public land management decisions; and when necessary files administrative protests and lawsuits. Rocky Mountain Wild has a history of participating in BLM oil and gas leasing decisions through submitting comments, protests, and litigating when necessary.  Rocky Mountain Wild also advocates for increased protections for the Gunnison sage-grouse and continues to work to ensure conservation of the species.

22.    Plaintiff SAN JUAN CITIZENS ALLIANCE ("SJCA") is a non-profit organization with over 1000 members in the Four Corners region. SJCA is actively involved in monitoring and

scrutinizing National Forest management, overseeing government decision-making and compliance with environmental laws, advocating for cleaner air quality and better stewardship of natural systems, promoting reduced energy consumption, energy efficiency and renewable energy, and working for improvements to community health. SJCA members are adversely affected by the BLMs leasing decision. SJCA brings this action on its own behalf and on behalf of its adversely affected members.

23.     Plaintiff CONSERVATION COLORADO is a non-profit organization with offices in Denver, Grand Junction, Durango and Craig and has 35,000 members. Conservation Colorado's mission is to protect Colorado environment and quality of life by mobilizing people and electing conservation-minded policymakers. As part of that mission, Conservation Colorado has a long standing and vested interest in the management of public lands in Colorado and particularly Bureau of Land Management lands. For over 50 years Conservation Colorado has frequently engaged in decision-making processes related to land-use planning, including lease sales and project-level planning to protect wilderness-quality lands, wildlife habitat, air and water resources as well as the quality of life for people all across Colorado. Plaintiffs have participated throughout the NEPA process regarding this decision.

24.     Plaintiffs timely submitted scoping comments on June 8, 2016.

25.     Plaintiffs timely submitted detailed comments on the BLM's Determination of NEPA Adequacy document on September 8, 2016.  A Determination of NEPA Adequacy cannot be relied upon to meet BLM's NEPA disclosure and public participation duties.  Potential lease parcel conditions, foreseeable impacts, and possible mitigation measures are not already addressed in an existing NEPA document.  A Determination of NEPA Adequacy is a non-NEPA document agencies sometimes use to confirm whether a previous NEPA document satisfies the agency's present NEPA duties.

26.    Plaintiffs timely submitted a Protest of the February 2017 Oil and Gas Lease Sale on December 12, 2016.  On March 8, 2017, BLM denied Plaintiffs' Protest.  Plaintiff has exhausted its administrative remedies and this case is ripe for judicial review.

27.    Each Plaintiff, specifically, San Miguel County residents, and the members of the private non-profit organizations, use, enjoy, and plan to continue to use and enjoy on a regular basis, the public lands and natural resources in the Tres Rios Field Office.  This includes land that contains habitat for the federally listed Gunnison sage-grouse.  Our members include scientists who have spent professional and personal time studying and advocating for the protection of the GUSG.  Members and staff also use these public lands affected by the leasing decision to recreate, seek solitude, learn, watch wildlife and for other personal and professional purposes.  Plaintiffs' members and staff seek protection of local watersheds and air quality.  These interests have been impaired by the BLM's failure to comply with NEPA and ESA statutory mandates for the March 2017 lease sale and the subsequent leasing of the challenged parcels.

28.    This leasing decision is causing, and continue to cause direct, immediate, and irreparable informational and procedural injury to Plaintiffs' interests by denying them and their members the right to informed decisionmaking and full disclosure required by NEPA.

29.     Unless the relief prayed for herein is granted, Plaintiffs and their members will continue to suffer ongoing and irreparable harm and injury to their interests, including their ability to view Gunnison sage-grouse and enjoy the area impacted by this leasing decision.

30.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. BLM is responsible for managing its lands, including the lands opened for oil and gas leasing and development in the Tres Rios Field Office.

31.    Defendant UNITED STATES DEPARTMENT OF INTERIOR is a cabinet-level agency that manages public lands and resources.  The Department of Interior manages actions taken by the Bureau of Land Management, such as oil and gas leasing.

## STATUTORY AND REGULATORY BACKGROUND

## National Environmental Policy Act ("NEPA")

32.    Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331.  Through NEPA, "Congress directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in" NEPA.  42 U.S.C. § 4332.

33.    To fulfill this stated goal, NEPA requires federal agencies to analyze the environmental impacts of a particular action before proceeding with that action. 42 U.S.C. § 4332(2)(c). In addition, federal agencies must notify the public of proposed projects and allow the public to comment on the fully-disclosed environmental impacts of a proposed action.  The agency analysis must be contained in an "environmental document." 40 C.F.R. § 1508.10.

34.    All federal agencies must carry out their NEPA duties "to the fullest extent possible" and no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid NEPA compliance. 42 U.S.C. § 4332 *et. seq.*  NEPA duties "are supplementary to those set forth in existing authorizations of Federal agencies." 42 U.S.C. § 4335.

35.    The DNA is not an "environmental document" that could satisfy BLM's lease-tier NEPA duties. 40 C.F.R. § 1508.10. The DNA fails to confirm compliance with BLM's NEPA duties.  BLM stated the DNA provided the basis to "verify conformance with the approved land use plan, and provides the rationale for the field office's recommendation to offer or to defer

10

particular parcels from the lease sale." *CO BLM February 2017 Oil and Gas Lease Sale DNA* at 3.

36.    NEPA requires that, until an agency issues a Record of Decision based on an Environmental Impact Statement, "no action concerning the proposal shall be taken which would: (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2).  NEPA prohibits agencies from making an "irreversible and irretrievable commitment of resources."40 C.F.R. §§ 1502.2(f).  The prohibition against taking action before NEPA compliance applies where an Environmental Assessment ("EA") is used to meet the agency's NEPA duties. 40 C.F.R. § 1508.9.

37.    A proposal exists at the stage in the development of an action when an agency has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated. 40 C.F.R. § 1508.23.

38.    NEPA contains "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a).  The NEPA process is based on an interdisciplinary analysis of the purpose and need of the agency action, alternative courses of action, direct, indirect and cumulative impacts of the action and connected actions, and mitigation measures. Only after adequately completing the NEPA process may an agency take action. *See* 42 U.S.C. § 4332.

39.    The first goal of NEPA is to ensure informed decisionmaking. NEPA sets forth specific procedural requirements federal agencies must follow as they carefully gather and evaluate relevant information about the potential impact of a range of alternative courses of proposed agency action on the environment.  42 U.S.C. § 4332.  NEPA's second goal is to ensure "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process" and

revealed available alternatives, thereby guaranteeing that the public is involved in and aware of agency processes. 40 C.F.R. §§1500.1(b); 1500.2(d); 1506.6.

40.     The cornerstone of NEPA is the environmental impact statement ("EIS") that federal agencies must prepare and circulate for public review and comment. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4.

41.     Federal agencies must prepare an EIS prior to initiating any major federal action significantly effecting the human environment to ensure the environmental impacts are considered and disclosed to the public during the decisionmaking process. 40 C.F.R. §§ 1501.2, 1502.5. In this document, the federal agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including a "no action" alternative) and their impacts, and identify "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented," 42 U.S.C. § 4332(2)(C)(v). This requirement is commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its proposed action.

42.     Federal agencies are also required to recognize three types of impacts, or effects:

> **Direct effects**, which are caused by the action and occur at the same time and place. 40 C.F.R. 1508.8(a) (emphasis added).  Direct effects of leasing public land for mineral extraction includes the subsequent drilling, development, and extractive processes.
>
> **Indirect effects**, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of

land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. 40 C.F.R. § 1508.8(b).

**Cumulative impacts**, which are the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

43.     NEPA requires federal agencies to consider three types of actions in an EIS; connected, cumulative, and similar. 40 C.F.R. § 1508.25. Connected actions are closely related actions that the BLM must discuss in the same impact statement. 40 C.F.R. § 1508.25(a)(l).  Connected actions are those that: (i) Automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification. *Id.* at § 1508.25(a)(1)(i-iii).

44.     Cumulative actions are those which "when viewed with other reasonably foreseeable or proposed actions have cumulatively significant impacts" should also be considered in the same impact statement. *Id.* at § 1508.25(a)(2).

45.     The federal agency must also identify and evaluate the effectiveness and feasibility of any mitigation measures adopted to alleviate identified impacts from the proposed action. 40 C.F.R. §§ 1502.14(t); 1502.16(h).

**Endangered Species Act ("ESA")**

46.    The ESA was enacted to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). To receive the full protections of the ESA, a species must first be listed by the Secretary as "endangered" or "threatened" pursuant to Section 4 of the ESA. *Id*. § 1533.

47.    Under the ESA, Federal agencies have an affirmative duty to protect and help recover listed species. 16 U.S.C. § 1536(a)(1).

48.    Once a species is listed as "endangered" or "threatened" under the ESA, it is protected under the Act's substantive and procedural provisions. The ESA prohibits any federal agency from taking any action found "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." *Id.* § 1536(a)(2).

49.    Under the ESA, a species is threatened when it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20*)*.

50.    The ESA prohibits any person from "taking" a threatened or endangered species. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.21, 17.31. To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. 16 U.S.C. § 1532(19).

51.    The ESA requires that all federal agencies "carry out programs for the conservation" of threatened and endangered species and consult with the Secretary in order to ensure that their actions are "not likely to jeopardize the continued existence" of such species. 16 U.S.C. § 1536(a)(1), (2).

52.     Through the ESA, FWS regulates federal agency actions that impact threatened and endangered species. Section 7(a)(2) of the ESA requires federal agencies to avoid actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2).  Jeopardy results when it is reasonable to expect that the action would "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.  Adverse modification occurs when it is reasonable to expect that the action will result in "a direct or indirect alteration that appreciably diminishes the value of critical habitat for … the survival [or] recovery of a listed species.  Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." Id. § 402.02.

53.     To ensure compliance with these Section 7(a)(2) prohibitions, the "action agency" must undergo a consultation process with FWS upon proposing to authorize, fund, or carry out an action that "may affect" a species or its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  The consultation process ensures a rigorous review of the actions' impacts on threatened and endangered species and serves as an independent check on the tendency of federal agencies to pursue their other goals and mandates at the expense of imperiled species.  "Formal" consultation is required when the agency's action is likely to "adversely affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14(a). Formal consultation concludes with a FWS biological opinion.  In a biological opinion, FWS determines whether "jeopardy" or "adverse modification" is likely to occur due to the action and, if so, sets forth the reasonable and prudent alternatives that could avoid such ESA violations. 16 U.S.C. § 1536(b)(3)(A).

54.     In the biological opinion, FWS must identify the action area, environmental baseline,

and the effects of the action. The "action area" includes "all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The "environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area." Id. The effects of the action include the direct, indirect, and cumulative effects to a species from a proposed agency action, as well as "interrelated and interdependent actions." Id. §§ 402.02 (defining "effects of action"), 402.14(c)(4) & (8).

55.     If, after the Federal agency has consulted with the Secretary, the Secretary concludes that the agency's actions are not likely to jeopardize the continued existence of the listed species in question, the Secretary shall provide the agency with an Incidental Take Statement ("ITS").  16 U.S.C. § 1536(b)(4)(A).

56.     The Secretary may also provide the agency with an ITS if the agency has offered reasonable and prudent alternatives which the Secretary believes are not likely to jeopardize the continued existence of the listed species in question.  *Id.*

57.     The ITS shall "(i) specif[y] the impact of such incidental taking on the species, (ii) specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, . . . and (iv) set[] the terms and conditions . . . that must be complied with by the Federal agency . . . to implement the measures specified under clause[] (ii)."  16 U.S.C. § 1536(b)(4)(C).

58.     Under FWS's regulations implementing the ITS process, the impacts of the take authorized by the ITS must be monitored and reported to FWS.  50 C.F.R. § 402.14(I)(3).

59.     The FWS ITS implementing regulations also require that if the amount of the take authorized by the ITS "is exceeded, the Federal agency must reinitiate consultation immediately."  50 C.F.R. § 402.14(i)(4).

60.     The other purpose of an ITS is to provide a trigger for reinitiating consultation when the authorized take limit is exceeded. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012).

## FACTUAL AND PROCEDURAL BACKGROUND

61.     The facts in this case will be established and the case resolved based on Administrative Procedure Act ("APA") review of the whole Administrative Record considered by the agency decisionmaker(s), as supplemented pursuant to relevant case law.

### The Lease Sale Parcels

62.     Defendants leased 17 parcels, covering 16,447.18 acres of land, in the March 2017 Lease sale.  Plaintiffs take issue with 10 of the leased parcels.  BLM did not analyze the current access to these parcels or the increased impacts of accessing these parcels to allow for oil and gas development. Plaintiffs' Comments and Protest highlighted the failure to analyze and compare the reasonably foreseeable impacts of alternative means to access these parcels. The BLM failed to respond to the comments or conduct any NEPA analysis of the effects of accessing these parcels.

63.     Parcels 78162, 78163, 78164, 78165, 78167, 78168, 78169, and 78170 are directly adjacent to or in close proximity to occupied Gunnison sage-grouse critical habitat.  The only way to access these parcels is on roads that travel directly through occupied critical habitat and within 1.9 miles of leks.[2]  Alternate means of access involve construction of new roads.  Parcel 78162 also overlaps land protected by a conservation easement for the purpose of Gunnison sage-grouse protection.  BLM has not estimated or analyzed the impacts of the increased traffic on Gunnison

_____

[2] A lek is important sage-grouse breeding ground that generally is located in close proximity to nesting and rearing habitat.  Grouse exhibit high site fidelity, returning to the same sites each year to breed; if a site is disturbed, breeding may not occur.

sage-grouse habitat.  BLM has not analyzed nor compared alternative means to access the parcels listed in this paragraph.

64.     Lease parcels 78167 and 78168 overlap with and are directly adjacent to the nominated Dry Creek Basin Area of Critical Environmental Concern. Dry Creek Basin is one of the ACECs that BLM found met the relevance and importance criteria but that was not evaluated for designation in the draft or proposed Tres Rios RMP.  Areas in Dry Creek Basin are now being considered for ACEC designation through the Tres Rios ACEC RMP Amendment process.  The Dry Creek Basin ACEC has been proposed to protect important Gunnison sage-grouse habitat.  Access to parcels 78162, 78163, 78164, 78165, 78167, 78168, 78169, and 78170 will result in foreseeable increases in traffic on roads cutting through the nominated Dry Creek Basin ACEC.  BLM has not estimated or analyzed the impacts of the increased traffic through the Dry Creek Basin ACEC.  BLM has not analyzed nor compared alternative means to access the Dry Creek Basin parcels.

65.     Parcels 78171 is in the designated Gypsum Valley Area of Critical Environmental Concern and may contain occurrences of the globally imperiled Gypsum Valley cat-eye.  This ACEC is being considered in the Tres Rios RMP ACEC amendment process.  Increased traffic and road access to this parcel could impact Gunnison sage-grouse occupied habitat. The failure to conduct lease stage NEPA analysis creates uncertainty around necessary stipulations and protections for this designated area.  BLM has not estimated or analyzed the impacts of the increased traffic on the Gypsum Valley ACEC.  BLM has not analyzed nor compared alternative means to access the Gypsum Valley ACEC parcels.

66.     Parcel 78173 is within the nominated Navajo River ACEC.  By creating private oil and gas lease interests in this parcel, BLM has irretrievably committed resources that limit the choice of alternatives available to the agency during the ongoing ACEC amendment process.  .BLM has not

estimated or analyzed the impacts of the increased traffic on the Navajo River ACEC.  BLM has not

analyzed nor compared alternative means to access the Navajo River ACEC parcel.

67.    BLM has recently posted a DNA for the March 2018 lease sale which contains 6 parcels

in the same geographic location as those challenged in this Complaint.  Leasing these parcels in the

March 2018 lease sale will compound the direct, indirect, and cumulative impacts of federal energy

development in this area on the Gunnison sage-grouse and other natural resources.  BLM's Colorado

Offices have an established pattern and practice of unlawfully relying on DNA's to justify lease sales

that lack lease-tier NEPA compliance.

### Gunnison Sage-Grouse

68.    The Gunnison sage-grouse was listed as a threatened species under the Endangered

Species Act in November, 2014. *See* U.S. Fish and Wildlife Service, Threatened Status for Gunnison

Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014).

69.    Approximately 88 to 93 percent of the species' historical range has been lost since

Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all

the populations to extirpation." Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,228. The

listing rule found that "the persistence of Gunnison sage-grouse is dependent on large and contiguous

sagebrush habitats, that human development and disturbance contribute to the decline of this needed

habitat, and that such impacts negatively affect the survival and persistence of Gunnison sage-

grouse." *Id.*

70.    The USFWS listing decision identified the lack of adequate regulatory mechanisms in

BLM Resource Management Plans as a major threat that contributed to the need for the Gunnison

sage-grouse to be protected as threatened under the ESA.

**Gunnison Sage-Grouse RMP Amendment**

71.    In response to this finding of inadequate regulatory mechanisms for BLM lands and

minerals, the Colorado and Utah BLM have undertaken a range-wide RMP Amendment process for

Gunnison Sage-Grouse habitat. The BLM determined that "a plan amendment is necessary to address

the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as

"threatened" under the Endangered Species Act." Draft GRPA pp. 1-3.

72.    To attempt to establish more effective regulatory mechanisms and account for new

scientific information "the BLM is undertaking a separate planning effort for GUSG habitat

throughout occupied habitat in Colorado to incorporate clear and consistent conservation measures

into BLM land use plans, for which the BLM published a Notice of Intent on July 18, 2014." RMP

ROD at I-16.  This RMP amendment process is set to be completed in the "Fall 2017."[3]

73.    The BLM's March 2017 Lease Sale contained parcels directly adjacent to Gunnison

sage-grouse critical habitat.  Accessing these parcels will require driving on roads that cut through

designated critical habitat and within 1.9 miles of leks.  Increased traffic on these roads will

negatively impact local grouse populations.  The BLM has failed to consider and analyze new

information about the species, GUSG habitat, threats, new studies and findings, or other relevant

information pursuant to NEPA or the ESA.

74.    The area impacted by leasing these parcels has already suffered from past, present, and

future impacts that have not been analyzed prior to making the plan-tier or lease-tier decisions. The

cumulative impacts and effects on the lease tracts and Gunnison sage-grouse include energy related

projects, burn areas, and other federal and non-federal actions.

---

[3] https://eplanning.blm.gov/epl-front-
office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=5348
8

**Resource Management Plan**

75.    The BLM's leasing decision relied on the 2013 NEPA analysis supporting the Tres Rios Field Office RMP.  The NEPA process analyzing the RMP was completed prior to the ESA listing of the Gunnison sage-grouse.  The RMP FEIS failed to consider new information about the Gunnison sage-grouse and changed conditions in the leasing area.

76.    The BLM leasing decision failed to disclose, analyze, or consider imposing stipulations outlined by the RMP FEIS to protect the GUSG from the impacts of increased traffic within 1.9 miles of leks.  Further, the leasing decision fails to consider stipulations and increased protections contemplated in the GUSG Rangewide Draft RMP Amendment.  Leasing these parcels prior to completion of the ongoing NEPA analysis for the RMP amendment process and the lease-tier NEPA analysis of these lease parcels allows adverse environmental impacts, limits the choice of alternatives, and ignores available mitigation measures, now and in the future.

77.    RMP stipulation 3.4.4 (Controlled Surface Use) restricts noise sources in occupied and unoccupied habitat.  This stipulation was not attached to any parcels even though these leases allow vehicle traffic noise and increased noise adjacent to and within designated critical habitat.

**Conference Opinion/Failure to Consult**

78.    The BLM failed to consult with the United States Fish and Wildlife Service regarding the impacts of this leasing decision on the Gunnison sage-grouse.

79.    The March 26, 2014 Conference Opinion supporting the RMP admits that "at this time, we are unable to predict where, when, and to what extent these impacts may occur. Therefore, we are unable to reasonably estimate the direct and indirect effects caused by these activities." *Conference Opinion* at 33.  The lease decisions resulted in the issuance of leases that specify the locations where private lessees are allowed to use and occupy federal lands to carry out oil and gas activities.

21

80.     Each lease incorporates Lease Exhibit CO-34, "Endangered Species Act Section 7 Consultation Stipulation."  The generic stipulation was adopted because BLM has confirmed that leasing may effect Gunnison sage-grouse and other ESA-listed species.  The ESA does not allow BLM to rely on promises of ESA consultation at the APD-tier to meet its lease-tier ESA duties.

### Conservation Easement

81.     Parcel 78162 impacts a conservation easement that is meant to protect Gunnison sage-grouse habitat and was used to justify excluding this area from critical habitat. *See* 79 FR 69311, 69313 ("final rule excludes specific properties from the critical habitat designation under section 4(b)(2) of the Act, namely … private lands under permanent conservation easement (CE)…").

82.     BLM's NEPA and ESA duties are not diminished where the federal oil and gas lease involves privately owned surface or conservation interests.  BLM's leasing decision destroys the FWS basis for excluding private lands subject to conservation easement from critical habitat designation.

### Areas of Critical Environmental Concern ("ACEC")

83.     The lease sale contained parcels overlapping both existing and proposed ACECs.  The ROD for the RMP admits that "the BLM intends to issue a Plan Amendment to address Areas of Critical Environmental Concern." RMP ROD at I-12.  That amendment process has not been finalized.

84.     Lease parcels overlap or will impact the recently nominated Big Gypsum and Dry Creek Basin ACECs.  BLM failed to consider these ACECs in the Tres Rios RMP, and are now considering them in an RMP ACEC amendment.  A lease parcel also overlaps the Navajo River

proposed ACEC that was found not to meet the relevance and importance criteria, but it is still a part of the ongoing ACEC Amendment Process and subject to comments aimed at approved designation.

85.     The ACEC RMP amendment process was a result of Plaintiffs' protest of the RMP. The BLM granted Plaintiffs' protest based on a finding that the agency inadequately analyzed ACECs in the Tres Rios RMP.  Leasing these parcels prior to completion of this amendment process will have adverse environmental impacts and limit the choice of alternatives.

**Other Agencies Concerns**

86.     The United States Fish and Wildlife Service commented that, "Due to the potential for indirect impacts to GUSG in the San Miguel population, we recommend deferral of parcels adjacent to occupied critical habitat…until the BLM GUSG plan amendment process is finished. It is possible that GUSG protections will be identified in the plan amendment that are not currently contained within the Tres Rios RMP, and, therefore, not currently applied to any parcels currently under consideration for leasing. This could include protections related to indirect, disruptive effects from oil and gas activity conducted outside of GUSG occupied habitat."

87.     Colorado Parks and Wildlife commented that "we remain concerned about indirect disturbance to GUSG from drilling operations and the increased noise and disturbance associated with increased truck traffic on existing and potential new roads through GUSG habitat to access parcels 7795, 7797, 7798, 7799, 7801, 7802, and 7805.[4] This issue is not addressed in the existing LRMP or through existing stipulations."

---

[4] These preliminary parcel ID numbers were assigned during the NEPA process and correspond to parcels 78162, 78163, 78164, 78165, 78167, 78168, 78169, and 78170, which are near Gunnison sage-grouse critical habitat.

88.     Despite the state and federal wildlife agencies' comments, BLM failed to alter, or

consider altering the lease sale to avoid or minimize wildlife impacts. The expert wildlife agencies'

comments highlight the need to conduct further analysis of the impacts of this leasing decision.

## CLAIMS FOR RELIEF

### CLAIM ONE

### Endangered Species Act

*The Failure to consult with USFWS is arbitrary, capricious, and not in accordance with law.*

89.     Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this

Complaint.

90.     Federal law prohibits any person from causing, or causing to be committed, violations

of the ESA. 16 U.S.C. § 1538.

91.     The decision to issue leases "may effect" the federally listed Gunnison sage-grouse and

other listed species.  16 U.S.C. § 1536.

92.     Defendants failed to consult with the United States Fish and Wildlife Service prior to

making a leasing decisions that will impact the federally listed Gunnison sage-grouse.

93.     Defendants failed to reinitiate consultation on the Conference Opinion supporting the

Tres Rios Field Office RMP.

94.     The issuance of leases violates the ESA prohibition against BLM taking actions that

"may effect" ESA listed species without first complying with BLM's consultation duties. 16 U.S.C. §

1536.

95.     The ESA contains a citizen suit provision that allows Plaintiffs to bring this ESA

enforcement action in federal court. 16 U.S.C. § 1540(g).

**CLAIM TWO**

**Endangered Species Act**

*BLM failed to satisfy its duty to conserve and recover Gunnison sage-grouse.*

96.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

97.    "[A]ll Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of" the ESA. 16 U.S.C.S. § 1531 (c)(1).

98.    Defendants failed to  meet its duty to utilize its authorities to ensure BLM's actions further ESA's purposes and to conserve and recover Gunnison sage-grouse prior to making leasing decisions that impact the federally listed Gunnison sage-grouse and its habitat.

**CLAIM THREE**

**National Environmental Policy Act**

*The BLM relied on a DNA and violated the NEPA by failing to use the NEPA process to take a hard look at its lease-tier decisionmaking.*

99.    Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

100.   The term "hard look" is a term of legal art used to summarize NEPA's action-forcing provisions that impose affirmative duties on all federal agencies.

101.   Defendants failed to prepare a lease-tier NEPA document that included the NEPA-mandated a hard look at the impacts of its March 2017 leasing decision.

102.   BLM violated the law by issuing one or more leases that allows development of federal minerals without considering, as NEPA requires, the unique and controversial effects of the federal drilling program.

103.   NEPA requires BLM to disclose and adequately consider reasonably foreseeable activities and environmental impacts when preparing RMPs and again before deciding to lease federal minerals and again before approving subsequent oil and natural gas drilling of leased federal minerals. NEPA must be carried out to the fullest extent possible at each of the three decisionmaking tiers BLM uses to implement the Mineral Leasing Act.

104.   BLM attempts to avoid analysis of significant oil and gas impacts by an unlawful tactic of manipulating NEPA tiering known as the "shell game." This tactic involves reliance on inadequate past analysis and promises of future analysis to avoid analysis of the current decision.

105.   Federal oil and gas leasing is analyzed under BLM's tiered approach to oil and gas decisionmaking.  The first tier of decisionmaking occurred in 2013 when BLM conducted NEPA analysis for the Tres Rios Field Office RMP.  The RMP provides general land management decisions.  The RMP did not approve the issuance of leases at any particular location. The RMP does not contain any lease tier or site-specific NEPA analysis regarding the environmental impacts of oil and natural gas leasing, exploration, or development.  Lease-tier alternatives include no-surface occupancy lease stipulations and operational requirements that protect the Gunnison sage-grouse.

106.   The second tier of BLM's decisionmaking occurred in 2017.  BLM leased parcels of BLM-managed subsurface estate located on lands managed by the Tres Rios Field Office."  BLM did not conduct any lease-tier NEPA analysis before issuing the leases.

107.   A Determination of NEPA adequacy is not a NEPA document.  *Pennaco Energy, Inc. v. United States DOI*, 377 F.3d 1147, 1162 (10th Cir.  2004).

108.   Lease-tier NEPA compliance is a case-specific inquiry that depends on site-specific facts that can ripen for judicial review at the lease tier of the BLM decisionmaking. *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718-719, (10th Cir. 2009).

109.   The lessees are not required parties to this lawsuit.  However, Plaintiffs will not oppose should a lessee file a timely and fully supported motion to intervene in the present lawsuit to address the claims herein.  The present suit does not impede a lessee's ability to protect any financial interests they may have where the district court does not have jurisdiction to address potential contract claims against BLM, which may be brought, if at all, in the Court of Claims.  *See Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 73 (Fed. Cl. 2012) (allowing mineral lease claims against U.S. to go forward).

110.   BLM is required to comply with the full requirements of NEPA, NEPA's implementing regulations, and FLPMA. BLM's failure to do so before deciding to lease federal minerals is arbitrary and capricious, an abuse of discretion, and not in accordance with the law.

111.   Under NEPA, BLM must "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2; *see also* 40 C.F.R. § 1501.1(a) (NEPA purpose). The failure to comply with FLPMA and NEPA in issuing the subject lease parcels is arbitrary and capricious, an abuse of discretion, and action without observance of procedures required by law, in violation of the APA.  5 U.S.C. § 706(2).

112.   Where BLM completes the leasing tier and issues a mineral lease without compliance with federal law, Plaintiffs' claim can be remedied by the District Court vacating the lease and declaring the lease void ab initio.  The relevant oil and gas leasing regulations state that a "[l]ease shall be subject to cancellation if improperly issued."  43 C.F.R § 3108.3(d).

113. Defendants failed to consider including a provision that allowed BLM to terminate, alter, or condition the leases based on prohibited take of Gunnison sage-grouse.

114. As a result of BLM's failure to conduct a lawful NEPA process that provided a hard look at the full range of impacts and alternate means to avoid known and foreseeable impacts within the lease-tier decisionmaking, BLM violated NEPA and its implementing regulations, acted arbitrary and capriciously, abused its discretion, and failed to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

## CLAIM FOUR

### Failure to Prepare an Environmental Impact Statement Where the Significance Threshold is met

*Defendants acted arbitrarily and capriciously by authorizing an action without determining whether NEPA's significance criteria were met.*

115. Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

116. NEPA requires agencies to prepare an Environmental Impact Statement when a federal action involves significant impacts. 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4. The leasing decision, when considered in context of the direct, indirect, and cumulative impacts of this and other actions is a major federal action significantly affecting the environment. *Id.*

117. When an EIS is not prepared, or the agency is uncertain whether or not the significance threshold has been met, an Environmental Assessment is the NEPA procedure that must be used if an agency is uncertain whether or not the significance threshold has been met. 40 C.F.R. § 1508.27. This inquiry must include an analysis "in several contexts, such as a whole (human, national), the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27(a). In addition, the

agency must analyze the severity of the action, such as whether impacts "may be both beneficial and adverse," "the degree to which the proposed action affects public health or safety," "unique characteristics of the geographic area," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(b)(1)-(5).

118.   In deciding to lease the subject parcels, BLM unlawfully abbreviated the required NEPA process and did not prepare an EA or EIS.  The impacts to the Gunnison sage-grouse, alone and in combination with the other allegations herein, satisfies the significance criteria and preclude the use of a DNA or a Finding of No Significant Impact.

119.   Impacts not analyzed at the planning tier that confirm significant impacts that require analysis in an EIS at the lease NEPA tier include, but are not limited to, the impacts to the federally listed Gunnison sage-grouse, ACECs, and other important values.  Agency attempts to avoid disclosure and analysis of significant oil and gas impacts and the alternative means to avoid and minimize such impacts by manipulating NEPA tiering is known as a "shell game" and is unlawful.

120.   Although truncated, the DNA and accompanying administrative record confirm that a lawful EA would confirm that the facts and circumstances require BLM to prepare an Environmental Impact Statement.

121.   As a result of BLM's failure to conduct a lawful NEPA process and issuance of the FONSI violated NEPA and its implementing regulations, acted arbitrary and capriciously, abused its discretion, and failed to act in accordance with the law, and therefore violated the APA, 5 U.S.C. § 706(2).

## CLAIM FIVE

### *Failure to Examine a Reasonable Range of Alternatives*

*Defendants acted arbitrarily and capriciously by failing to consider a reasonable range of alternatives to protect the public lands and Gunnison sage-grouse.*

122.   Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

123.   Agencies are required under NEPA to consider, evaluate, and disclose to the public "alternatives" to the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of resources."  42 U.S.C. §§4332(2)(C)(iii) & (E); 40 C.F.R. §1502.14.  The evaluation of alternatives must constitute a "substantial treatment," presenting the impacts of the alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public." 40 C.F.R. §1502.14.

124.   Here, BLM failed to consider, as required, a reasonable range of lease-tier alternatives for protecting the public lands and Gunnison sage-grouse by failing to study, develop, describe, analyze, and compare alternative courses of action, including a no action alternative.

125.   The DNA, and the RMP NEPA analysis, do not disclose or analyze the technologies and means used to drill, produce, plug, and abandon wells in the area surrounding these lease parcels. These omissions are compounded by BLM's failure to discuss or consider reasonable alternatives that have been or could be used on these leases to avoid or minimize adverse impacts.

126.   BLM's failure to consider a reasonable range of alternatives that avoid or minimize impacts to the environment violates NEPA and NEPA's implementing regulations. This constitutes arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM SIX

### *BLM Did Not Provide a Legally Sufficient Purpose and Need*

*Defendants acted arbitrarily and capriciously in not providing a purpose and need or explanation of the proposed project, resulting in a violation of NEPA and NEPA's implementing regulations.*

127.   Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

128.   BLM failed to provide a statement of purpose and need for the leasing project in a NEPA document. 40 C.F.R. § 1502.

129.   BLM's failure to comply with NEPA and its implementing regulations is arbitrary and capricious, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM SEVEN

### *BLM Failed to Take a Hard Look at Direct, Indirect, and Cumulative Impacts of Leasing*

*Defendants unlawfully made this leasing decision without analyzing the impacts of its action.*

130.   Plaintiffs repeat and incorporate by reference the allegations all paragraphs of this Complaint.

131.   NEPA requires BLM to consider three types of effects.  40 C.F.R. § 1508.8. BLM must consider direct effects, which are those that are caused by the action and occur at the same time and place.  40 C.F.R. § 1508.8(a).

132.   BLM must consider indirect effects, which are those that are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  40 C.F.R. § 1508.8(b).

133.   BLM must also consider cumulative impacts.  40 C.F.R. § 1508.7.  Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. *Id.* Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.*

134.   BLM did not comply with the "hard look" requirements under NEPA and NEPA's implementing regulations before approving the challenged action. BLM's failure to analyze impacts outside the immediate project area, including specially designated public land within close proximity of the proposed project site, is one example of BLM's failure to comply with the "hard look" mandate.

135.   BLM's violations constitutes arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM EIGHT

### *Failure to Prevent Unnecessary or Undue Degradation of the lands:*

*Defendants acted arbitrarily and capriciously by failing to comply with its substantive duty to prevent unnecessary or undue degradation of the public lands.*

136.   Plaintiffs repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

137.   Under FLPMA, BLM has a substantive, non-discretionary duty to "take any action necessary to prevent unnecessary or undue degradation ("UUD") of the lands." 43 U.S.C. § 1732(b). BLM must disclose and analyze its FLPMA duties in the NEPA process, which mandates analysis of a range of alternative mitigation measures and their effectiveness.

138.   Defendants violated this requirement by, among other things, failing to consider or adopt any lease-tier stipulations to address road systems, horizontal drilling, well spacing, stimulation

techniques, unauthorized drainage of unleased and private minerals, and other currently foreseeable impacts and commitments of resources that would escape review at the site specific tier.

139.   Defendants' violation of UUD requirements includes but is not limited to: failing to adequately protect and mitigate impacts to wildlife that have been documented on-site, failing to determine other wildlife present on-site and in the vicinity that would be impacted by the challenged action and to enact proper mitigation measures, failing to determine what historical and cultural resources may be affected and enact proper mitigation measures and failing to consider other resources that will be inappropriately impacted by this leasing decision.

140.   Defendants violated NEPA by failing to disclose and analyze the actions necessary to prevent UUD of the public lands, including reasonable mitigation measures.

141.   Defendants violated NEPA by failing to analyze a monitoring program to ensure the UUD duty is met and mitigation measures are effectively implemented.

142.   Defendants' failure to prevent UUD to important resources is arbitrary and capricious, an abuse of discretion, and action without observance of procedures required by law, in violation of the APA.  5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiffs respectfully requests that this Court enter judgment providing the following relief:

A.  Enter judicial findings that Defendants violated NEPA, ESA, APA, MLA, and/or FLPMA when it decided to lease minerals in the March 2017 Colorado Lease Sale;

B.  Enter judicial findings that Defendants violated NEPA, ESA, APA, MLA, and/or FLPMA when offering leases, accepting bids, and in approving leases without NEPA compliance;

C.  Set aside and vacate each and every agency action taken and each and every finding, and

conclusion made in reliance on the DNA, including the offer to lease and the issuance of leases;

D.  Set aside and vacate the federal oil and gas leases and declare the lease(s) invalid ab initio;

E.  Remand this matter to BLM for further action based on a clean slate and in accordance with

applicable laws;

F.  In the alternative, direct by permanent injunction that Defendants shall not approve any APD

request and shall prohibit any implementation of the DNA and Decision Record until such time as an

adequate and appropriate lease-tier NEPA process and lease amendments have been fully considered

and completed for all lease parcels;

G.   In the alternative, direct by permanent injunction that BLM take all the necessary steps to avoid

further impacts to, among other resources and values, the Gunnison sage-grouse, water resources,

wildlife, and public lands that may be impacted by the challenged action;

H.   In the alternative, direct by injunction that BLM withhold any approvals concerning any oil and

gas lease, including the prohibition of any ground disturbance, exploratory activities, additional lease

issuances, lease extensions, lease renewals, and on-site implementation;

I.  Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;  and the ESA, 16 U.S.C. § 1540

and/or,

J.  Grant Plaintiffs' such additional and further relief as the Court may deem just and proper.

***RESPECTFULLY SUBMITTED this 10th Day of October, 2017***

s/ Matthew Sandler
**Matthew Sandler**
Rocky Mountain Wild
1536 Wynkoop St. Suite 900

Denver, CO 80202
303-579-5162
Matt@rockymountainwild.org

*Attorney for Plaintiffs*


s/ Travis E. Stills
**Travis E. Stills**
Energy & Conservation Law
1911 Main Ave., Suite 238
Durango, Colorado 81301
(970) 375-9231
stills@frontier.net

*Attorney for Plaintiffs*


Addresses of Plaintiffs:

**San Miguel County**
P.O. Box 791
333 West Colorado Avenue, 3rd Floor
Telluride, CO  81435

**Rocky Mountain Wild**
1536 Wynkoop St., Suite 900
Denver, CO 80202

**Conservation Colorado**
1536 Wynkoop St., Suite 510
Denver, CO 80202

**San Juan Citizens Alliance**
P.O. Box 2461
1309 East 3rd Ave., Suite 5
Durango, CO 81302