## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 2017-cv-2432-RPM

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SAN MIGUEL, COLORADO ; ROCKY MOUNTAIN WILD; SAN JUAN CITIZENS ALLIANCE; CONSERVATION COLORADO

      Plaintiffs,

      v.

UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR

      Defendants.

---

### PLAINTIFFS' OPENING MERITS BRIEF

---

Plaintiffs, through counsel, file this Opening Merits Brief in this civil litigation brought pursuant to the Administrative Procedure Act (5 U.S.C. § 701 *et seq.)* and the citizen suit provision of the Endangered Species Act. 16 U.S.C. § 1540(g).

## TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY ............................................................... 3

II.    STATUTORY AND REGULATORY BACKGROUND .................................... 7

    A.    National Environmental Policy Act ............................................................. 7

    B.    Endangered Species Act ............................................................................ 9

    B.    NEPA and ESA Duties, as Applied to Actions Involving the Mineral Leasing Act of 1920 and the Federal Land Policy and Management Act ............................................. 11

III.    JURISDICTION .................................................................................... 14

    A.    Standing .................................................................................................... 14

    B.    NEPA and FLPMA Claims are Justiciable ................................................. 20

    C.    ESA Claims are Justiciable ....................................................................... 21

IV.    STANDARD OF REVIEW .................................................................... 25

IV.    ARGUMENT ........................................................................................ 28

    A.    BLM Issued Leases for Specific Parcels without the Benefit of Lease-tier ESA Consultation ........................................................................................... 28

        1.    BLM Admits it did not Consult on the Leases that May Affect Gunnison Sage-Grouse ............................................................................................ 29

        2.    BLM Relies on Plan Level Consultation .................................................. 31

        3.    BLM Gunnison Sage-Grouse RMP Amendment. ..................................... 32

        4.    Analysis of Foreseeable Effects Cannot be Delayed Until Post-Leasing Consultation ........................................................................................... 33

    B.    National Environmental Policy Act Claims ................................................. 34

        1.    BLM Issued Leases without Preparing Lease-tier NEPA analysis. ........... 36

        2.    BLM Failed to Examine Reasonable Lease-Tier NEPA Alternatives........ 39

            a.  NSO, CSU, and Other Infrastructure Alternatives were not Analyzed ............... 42

            b.  No Action Alternative was not Analyzed ........................................... 45

        3.    Purpose and Need for these Lease Tracts was Never Identified. .............. 47

        4.    The Location of the Lease Tracts Reveals Significant Impacts that Require Analysis in an Environmental Impact Statement. ........................................................ 48

    C.    BLM Failed to Address its FLPMA Duty to Prevent Unnecessary and Undue Degradation ........................................................................................... 54

    D.    BLM Did not Maintain an APA-Compliant Administrative Record. ............ 57

V.    RELIEF ................................................................................................ 59

VI.    CONCLUSION .................................................................................... 62

I.    **INTRODUCTION AND SUMMARY**

The federal agency action at issue is the Bureau of Land Management's ("BLM") administrative process and sale of seventeen[1] oil and gas leases in an area occupied by the Endangered Species Act ("ESA") listed Gunnison sage-grouse. 79 Fed. Reg. 69,192 (Nov. 20, 2014) (final rule establishing threatened status); 79 Fed. Reg. 69,311 (Nov 20, 2014) (final rule designating critical habitat).  BLM sold seventeen leases without benefit of the analysis required by the National Environmental Policy Act ("NEPA") and the consultation required by the ESA. This lawsuit respectfully requests the presumptive Administrative Procedure Act ("APA") and ESA remedy for meritorious claims, which is to set aside the Determination of NEPA Adequacy ("DNA") (BLM11225-308), the Decision Record (BLM11311-14), and the ten leases that BLM issued in San Miguel County. BLM11864-12173.

In upholding the ESA listing and critical habitat designation, Judge Arguello recently summarized the historic and current range of the Gunnison sage-grouse.

> Gunnison sage-grouse are ground-dwelling birds considered obligate users of a sagebrush landscape and thereby historically located in southwestern Colorado, southeastern Utah, northwestern New Mexico, and northeastern Arizona. (AR at 199412.) At the time of the Final Rule [November 20, 2014], the range of the Gunnison sage-grouse included only southwestern Colorado and southeastern Utah (Doc. ## 156 at 8; 143 at 13-14) and the rangewide population of the species was estimated at 4,705 birds (AR at 199404-408) grouped into seven populations. Gunnison Basin (Unit 6) population contains most of the species, nearly 4,000 birds. The remaining birds are isolated in six smaller "satellite" populations (ranging from 10 to 206 birds) identified as Monticello-Dove Creek (Unit 1), Piñon Mesa (Unit 2), San Miguel Basin (Unit 3), Cerro Summit-Cimarron-Simms Mesa (Unit 4), Crawford (Unit 5), and Poncha Pass. (AR at 199401-406.) All populations are located in Colorado, with the exception of Units 1 and 2, which extend into Utah.

---

[1] BLM's proposed action involved twenty lease tracts. BLM11227-8.  BLM altered the number and boundaries internally, resulting in the Decision Record that approved deferral of eight tracts and sale of seventeen leases in March 2017. BLM11311. This litigation requests the BLM decisions and the ten leases in San Miguel County be set aside. *See e.g.* Ex. 1 (Holstrom Dec.).

*Colorado v. United States Fish & Wildlife Serv*., 2018 U.S. Dist. LEXIS 166422, at *3-4 (D. Colo. Sep. 27, 2018).

The USFWS proposed rule to list Gunnison sage-grouse describes several threats to the San Miguel Basin population, including but not limited to livestock grazing (78 FR 2503,2504), cheatgrass (78 FR 2507), and oil and gas development (78 FR 2512, 2526). Additional threats include off road vehicle use, minerals development, utility corridors, and fire and fuels management.

These leases were issued in the "San Miguel Basin (Unit 3)." *Id. see also* BLM09619 (map identifying critical habitat and leases in San Miguel County), BLM02569 (BLM map of Gunnison sage-grouse range), BLM06199 (BLM lease sale map). Plaintiffs rely on NEPA and ESA procedures to inform the public and decisionmakers that the San Miguel population is vulnerable and important to recovery and survival of the species. Ex. 2 Braun Decl. at ¶¶26 – 27, Ex. 2-6. NEPA analysis would redress the injuries by informing BLM of the effects and opportunities to alter its San Miguel Basin leasing decisions. *Id.*

BLM does not claim to have conducted lease-specific NEPA analysis for the March 2017 leasing decisions or sale of leases[2], relying instead on DNA's. BLM11316. BLM's DNA's rely on the analysis from the 2013 RMP and plan-level EIS. BLM11317. The DNA confirms potentially significant impacts of oil and gas activity, including impacts on the San Miguel population, which was not subjected to detailed analysis in the program-tier EIS. BLM06518-19. The RMP makes program level decisions on areas available for leasing, but because the

---

[2]The sale date was changed, and much of the record refers to a "February 2017 lease sale." "March 2017" is used in this brief for consistency and to avoid confusion.

Conference Opinion did not analyze specific parcels, the RMP level decisionmaking disavows analysis of future lease offerings or the need to adopt No Surface Occupancy ("NSO") or controlled surface use ("CSU") stipulations to address impact of new leases.

> We recognize that it is possible for oil and gas development (i.e. roads and well pads to occur within the critical habitat polygons […]. Use of the NSO and/or the CSU does not preclude all effects to grouse, and would only apply to future leases for oil and gas development. At this programmatic level, we do not have sufficient information about where, when, or to what extent, actions may occur that may affect GUSG or its occupied critical habitat.

BLM01409-1410.

The necessary information became available at the lease stage, but no ESA consultation or NEPA analysis was conducted at the leasing stage to inform the option of not issuing some or all the leases or including NSO, CSU, or other site-specific lease stipulations.  The Gunnison sage-grouse has critical habitat and occupied habitat in close proximity to these lease tracts and the roads used to access the lease tracts.  BLM09619.  BLM's DNA contains no effort to identify distance between the leks[3] and the roads or lease tracts.  BLM06514-22 (word "lek" not used in DNA).

Despite direction in the RMP, BLM did not use the information "about where, when, or to what extent [leasing] may affect" Gunnison sage-grouse, despite BLM policy mandating *additional* lease-tier NEPA analysis.

> In the second phase, through state offices, BLM identifies parcels that it will offer for lease, responds to potential protests of the suggested parcels, and conducts 'a competitive lease sale auction. […] During the identification of parcels available for leasing, a 2010 Department of Interior policy mandates additional review, including: (1) an interdisciplinary team reviewing the parcels proposed for leasing

---

[3]"A lek is important sage-grouse breeding ground that generally is located in close proximity to nesting and rearing habitat. Grouse exhibit high site fidelity, returning to the same sites each year to breed; if a site is disturbed, breeding may not occur." ECF No. 1 at ¶63 FN2 (admitted).

and conducting site visits; (2) identifying issues BLM must consider; and (3) obliging BLM to consult other stakeholders.'

*Wilderness Workshop v. United States BLM*, 2018 U.S. Dist. LEXIS 178506, at *7 (D. Colo. Oct. 17, 2018) citing *Pennaco Energy, Inc. v. United States DOI*, 377 F.3d 1147, 1162 (10th Cir. 2004) (citing 43 C.F.R. Subpart 3120).

Similarly, the programmatic ESA consultation did not look at the Gunnison sage-grouse in detail, or the San Miguel population. The "may affect" and take determinations that characterize Section 7 consultation for specific lease tracts simply were not addressed in the 2014 Conference Opinion issued for the RMP.

> At this broad programmatic level, the best information available is not sufficient to determine any specific level of anticipated take. However, project specific section 7 consultation analyses, subsequent to the proposed action, will reexamine this issue. Since the best information available does not permit us to determine a specific level of take, we are not exempting any take associated with implementation of the proposed action [plan level decisions].

BLM01416. Each lease contains a number of NSO and CSU stipulations, but none specifically to protect the Gunnison sage-grouse from the effects of pre-production activities on the lease tracts or the roads leading to the tracts. *See* BLM11864 *et seq.* (Leases).

In short, BLM ignored its legal duties and its own documents and policies when issuing these leases. BLM's promise of future analysis rings hollow from the planning stage, and rings hollow again at the leasing stage now that BLM has issued leases in the middle of an area of sage brush habitat critical to Gunnison sage-grouse. BLM09619. This suit is brought to gain the procedural protections and environmental protection mandates in the Federal Land Policy Management Act ("FLPMA"), NEPA, and the ESA that prohibit agencies from taking uninformed actions by promising future study of impacts that are known when the agency grants irretrievable and irrevocable private rights in federal public lands. "Although Defendants'

6

assurances of future NEPA review possess a certain pragmatic appeal, such assurances cannot obviate the need for compliance with NEPA regulations." *Sierra Club v. United States DOE,* 255 F. Supp. 2d 1177, 1186-90 (D. Colo. 2002) (holding issuance of easements for mine access arbitrary and capricious when approvals preceded NEPA compliance and ESA consultation).

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  NEPA was enacted in 1970 "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment" as well as recognizing that "each person should enjoy a healthful environment."  40 C.F.R. § 1500.1(c); 42 U.S.C. § 4331(b).  Accordingly, NEPA ensures that federal agencies <u>prior</u> to approving a project proposal (1) consider and evaluate all environmental impacts of their decisions, and (2) disclose and provide an opportunity for the public to comment on such environmental impacts. 40 C.F.R. §§ 1501.2, 1502.5; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  The twin aims of NEPA—informed agency decisionmaking and public involvement—ensure better decisions.  *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 703 (10th Cir. 2009) *citing Balt. Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983).

An agency may only take action after completing its duties in the NEPA process "to the fullest extent possible."  *See* 42 U.S.C. § 4332.  Agencies meet NEPA purposes by following a set of procedures that result in the preparation of an Environmental Impact Statement (EIS), an Environmental Analysis ("EA"), or Categorical Exclusion ("CE"), depending on the context and

intensity of the impacts. *Robertson,* 490 U.S. at 350 (1989); *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006).

The NEPA process provides an agency's "hard look" during an interdisciplinary analysis of the purpose and need of the proposed agency action, alternative courses of action, direct, indirect, and cumulative impacts of the action and connected actions, as well as mitigation measures that avoid impacts. *Id.* Federal agencies are required to take a "hard look" at the consequences to communities and the environment that a proposed action will have. *Citizens' Comm. to Save Our Canyons,* 513 F.3d 1169, 1179 (10th Cir. 2008) *quoting Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir. 1997). An agency's "hard look" examination "must be taken objectively and in good faith." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1263-64 (10th Cir. 2011) (*citations omitted*). A "hard look" examination must not be taken "as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Id.*

The Tenth Circuit recently reaffirmed the importance of NEPA documentation and analysis in federal agency decisionmaking.

> In NEPA, Congress codified rules designed to focus both agency and public attention on the environmental effects of proposed actions and thereby facilitate informed decisionmaking by agencies and allow the political process to check those decisions.

*Audubon Soc'y of Greater Denver v. United States Army Corps of Eng'rs*, U.S. App. LEXIS 31227, at *3 (10th Cir. Nov. 5, 2018) *quoting WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (quotation marks and alteration omitted).

## B.  Endangered Species Act

Congress adopted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

> The ESA constitutes "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species . . . [and] reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies.

*Sierra Club v. United States DOE*, 255 F. Supp. 2d 1177, 1187 (D. Colo. 2002) *quoting Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Listing a species as endangered or threatened "imposes a wide array of protections for the conservation of imperiled species" and their critical habitat. *Id*.

Section 9 of the Endangered Species Act makes it unlawful to "take" members of an endangered species. 16 U.S.C. § 1538(a)(1)(B).[4]  The ESA's "take" prohibition protects the species' feeding, breeding, nesting, and other habitat, even if not designated as "critical habitat." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703, (1995) (upholding interpretation of "'harm' to include indirectly injuring endangered animals through habitat modification").  The ESA provides procedures, however, by which "take" of an endangered or threatened species may be authorized, and liability under Section 9 may be avoided. *Id*.

Section 7 includes substantive protections and "take" authorizations based on procedural protections that are triggered when an agency action "may affect" a listed species or its critical habitat. *Colo. Envtl. Coalition v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1219 (D. Colo.

---

[4] "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). The FWS has defined "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife." 50 C.F.R. § 17.3. 16 U.S.C. § 1540 provides civil and criminal penalties for violations of Section 9.

2011).  "This 'may affect' standard triggering the consultation requirement is low. 'Any possible

effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal

consultation requirement . . . .'" *Id.* at 121-22 *quoting* 51 Fed. Reg. 19,926, 19,949 (June 3,

1986).  Section 7 requires inter-agency consultation in connection with any action "authorized,

funded, or carried out" by a federal agency that may jeopardize endangered or threatened species

or their habitat. 16 U.S.C. § 1536(a)(2).

Section 7 and its implementing regulations "apply to all actions in which there is

discretionary Federal involvement or control." 50 C.F.R. § 402.03; *Rio Grande Silvery Minnow*

*v. Bureau of Reclamation*, 601 F.3d 1096, 1104 (10th Cir. 2010). "Action" is defined as "all

activities or programs of any kind authorized or carried out, in whole or in part, by Federal

agencies…." 50 C.F.R. § 402.02.  In a Section 7 consultation, if the United States Fish and

Wildlife Service ("USFWS") as consulting agency makes a "no jeopardy" determination, it must

include an incidental take statement in its Biological Opinion that, among other things,

"[s]pecifies the impact, *i.e.*, the amount or extent, of such incidental take on the species." 50

C.F.R. § 402.14(i)(1)(i); 16 U.S.C. § 1536(b)(4).

Section 7(a)(2) of the Endangered Species Act requires that:

> Each Federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency
> (hereinafter in this section referred to as an "agency action") is not likely to
> jeopardize the continued existence of any endangered species or threatened species
> or *result in the destruction or adverse modification of habitat* of such species which
> is determined by the Secretary, after consultation as appropriate with affected
> States, to be critical….

16 U.S.C. § 1536(a)(2) (emphasis added). The Supreme Court has stated that "[o]ne would be

hard pressed to find a statutory provision whose terms were any plainer," and that the structure

of the Endangered Species Act "indicates beyond doubt that Congress intended endangered

10

species to be afforded the highest of priorities." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173-74 (1978).

Reinitiation of formal consultation is also required and shall be requested by the BLM or the USFWS and/or NMFS where discretionary control over the action has been retained and (1) the amount or extent of incidental taking specified in the ITS is exceeded, (2) new information reveals that effects of the action may affect listed species or designated critical habitat in a manner or extent not previously considered, (3) the action is modified in a way that may affect listed species or critical habitat in a way not considered in the biological opinion, and/or (4) a new species is listed or critical habitat is designated that may be affected by the action. BLM00209, 50 C.F.R. § 402.16(a).

When an agency action may effect a species *proposed* for ESA listing, the agencies must confer and USFWS will issue a Conference Opinion. 50 CFR §402.1.  After a species has been fully listed under the ESA, a Conference Opinion can be adopted as a biological opinion if "no significant new information is developed (including that developed during the rulemaking process on the proposed listing or critical habitat designation) and no significant changes to the Federal action are made that would alter the content of the opinion." *Id.* at §402.1(d).

**B.    NEPA and ESA Duties, as Applied to Actions Involving the Mineral Leasing Act of 1920 and the Federal Land Policy and Management Act**

Congress passed the Mineral Leasing Act of 1920 ("MLA") in response to mismanagement and abuse of oil and gas rights involving public lands and formally established a fluid mineral leasing program for federally owned oil and gas.  30 U.S.C. §§ 181 *et seq.*  The MLA, as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("FOOGLRA"), 30 U.S.C. §§ 188 *et seq.*, and in conjunction with the Federal Land Policy and

Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, governs oil and gas exploration and development of federal fluid minerals. BLM has the duty and authority to regulate and impose conditions throughout the three-tiered decisionmaking process and to ensure the environment and other resources are protected. *Pennaco*, 377 F.3d 1147, 1151 (10th Cir. 2004) ("DOI manages the use of federal oil and gas resources through a three-phase decision-making process": planning, leasing, and site-specific approvals.).

Under FLPMA, BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation ("UUD") of the lands." 43 U.S.C. §1732(b). This "UUD" standard is a non-discretionary, substantive duty that requires BLM to prevent UUD of public resources, including mineral resources, and is the "heart of FLPMA." *Mineral Policy Ctr. ("MPC") v. Norton*, 292 F.Supp.2d 30, 42 (D.D.C. 2003).

In carrying out its FLPMA and MLA authority, BLM must disclose and analyze its mineral leasing duties and options in the NEPA process, through ESA consultation with USFWS, and before taking action. *Pennaco*, 377 F.3d at 1151. BLM generally uses a three-tiered decisionmaking process in carrying out its Mineral Leasing Act activities. *Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1159 FN11 (10th Cir. 2013) (recognizing general rule that leases are ripe for judicial review, but holding that interim steps taken toward leasing in an undeveloped region were not ripe). "First, BLM 'develops land use plans — often referred to as resource management plans (RMPs).'" *Id. quoting Pennaco*, 377 F.3d at 1151. "'Next, BLM issues a lease for the use of particular land.'" *Id. quoting N.M. ex rel. Richardson*, 565 F.3d at 716. Third, "'[t]he lessee may then apply for a permit to drill, and BLM will decide whether to grant it.'" *Id*.

Here, the process is in its second tier - leasing.

In the second phase, through state offices, BLM identifies parcels that it will offer for lease, responds to potential protests of the suggested parcels, and conducts "a competitive lease sale auction." *Id.* at 1162 (citing 43 C.F.R. Subpart 3120). During the identification of parcels available for leasing, a 2010 Department of Interior policy mandates additional review, including: (1) an interdisciplinary team reviewing the parcels proposed for leasing and conducting site visits; (2) identifying issues BLM must consider; and (3) obliging BLM to consult other stakeholders. *Id.*

*Wilderness Workshop v. United States BLM,* 2018 U.S. Dist. LEXIS 178506, at *7 (D. Colo. Oct. 17, 2018) (holding that BLM failed to analyze reasonable alternatives in a program-tier challenge). Whether at the program or lease tier, "even if there is a minimal chance for development, [leasing] would detract from BLM designating that land for other uses." *Id.*   The *Wilderness Workshop* holding applies equally to decisions to actually lease, because the alternatives analysis would "allow BLM to consider other uses for that land" informed by site-specific conditions on the lease tracts. *Id* at *46 (D. Colo. Oct. 17, 2018).  Mineral Leasing Act regulations confirm the power to cancel leases issued without compliance with federal law, which is analogous to a district court setting aside the lease and declaring the lease void *ab initio*. 43 C.F.R. §3108.3(d).

ESA consultation and NEPA analysis are federal mandates, incorporated into BLM's policies that require BLM to analyze impacts and disclose options for lease parcels whose locations were not known at the program level.  BLM did not take a NEPA hard look at the site specific impacts of leasing or consult with the USFWS before deciding to issue leases that went beyond the availability determination in the RMP and created a private right to explore and develop oil and gas by leasing these parcels of federal land.

### III.    JURISDICTION

Plaintiffs have plead, and now provide evidence confirming that this Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1346, where this action involves the United States as a defendant and arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), NEPA, 42 U.S.C. §§ 4321 *et seq.*  Venue is not contested. Plaintiffs participated in each step of the leasing process that was offered, notwithstanding that BLM issued the leases without offering any opportunity to comment on NEPA analysis prepared to inform the decision to issue leases.

### A.    Standing

Plaintiffs proffer 5 attached declarations as evidence to show standing, a jurisdictional perquisite often contested by federal agencies seeking to avoid judicial review of claims brought by community and conservation organizations.  Plaintiffs have "the burden of establishing an actual or imminent injury that is concrete and particularized rather than conjectural or hypothetical; a causal connection that is "fairly traceable" to the conduct complained of; and a likelihood of redressability in the event of a favorable decision*." Id.; see also Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv*., 75 F.3d 1429, 1433 (10th Cir. 1996); *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

"In resolving a standing issue, however, we must start from the premise that the plaintiff will prevail on its merits argument."  *WildEarth Guardians v. United States EPA*, 759 F.3d 1196, 1207 (10th Cir. 2014).  The Supreme Court has long held that, "[w]hile generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic [sic] interests of the plaintiff, that will suffice."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) *citing Sierra Club v. Morton*, 405 U.S. 727, 734-

736 (1972) ("interest alleged to have been injured 'may reflect 'aesthetic, conservational, and recreational' as well as economic values.'") *quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

The attached declarations, combined with the materials in the Administrative Record, demonstrate the required injury. "'Under [NEPA] an injury results not from the agency's decision, but from the agency's uninformed decisionmaking.'" *Jackson Hole Conservation Alliance v. Babbitt*, 96 F. Supp.2d 1288, 1294 (D.Wyo. 2000), *quoting Rio Hondo*, 102 F.3d at 452. "A litigant shows an injury to its concrete interest by demonstrating either a geographical nexus to or actual use of the site of agency action." *Sierra Club v. United States DOE*, 287 F.3d 1256, 1265 (10th Cir. Colo. 2002).  Similarly, wildlife interests are a proper basis on which to base standing. "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233-1234 (10th Cir. Utah 2010) (citations omitted), s*ee* S*an Luis Valley Ecosystem Council v. United States Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1241-1242 (D. Colo. 2009) (granting injunctive relief after confirming standing) *quoting Save Strawberry Canyon v. Dep't of Energy*, 613 F.Supp.2d 1177, 1187 (N.D. Calif. 2009) ("There is no doubt that the failure to undertake an EIS when required to do so constitutes procedural injury to those affected by the environmental impacts of a project.") *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 & n. 7 (1992).

The attached declarations are proffered to satisfy Plaintiff's jurisdictional showings and to address any equitable concerns that may arise. Ex. 1-5.  Plaintiffs' (and Plaintiffs' members') comments, correspondence, and administrative protests are found throughout the Administrative Record and also provide ample evidence to support Article III jurisdiction. *See e.g.*  BLM06433-

35, BLM08660, BLM09947-76, BLM10270-311. Once standing has been established for one Plaintiff, the Court need not expend judicial resources to confirm all Plaintiffs have standing. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), *Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160 (1981) ("Because we find [that one plaintiff] has standing, we do not consider the standing of the other plaintiffs."). A summary of the declarations are provided for convenience, each of which establishes Article III jurisdiction for each Plaintiff.

The BLM-managed federal public lands, ACECs, lease tracts, the roads leading to the lease tracts, and the San Miguel population of Gunnison sage grouse are located in San Miguel County. The declaration of San Miguel County Commissioner Kris Holstrom (Ex. 1) sets out the harms the County would incur, including the harms flowing from BLM's denial of a government's "procedural right" to informed federal decisionmaking, which here is set out in the NEPA and ESA. *Massachusetts v. EPA*, 549 U.S. 497, 504 (2007). Uninformed oil and gas leasing threatens the lands, wildlife, historic, and cultural aspects of the County. Commissioner Hostrom has the responsibility of ensuring health, safety and welfare, including environmental heath within the County. The County's harms can be remedied by an order from this Court requiring the BLM to carry out its duties in accordance with the informed decisionmaking mandates of federal law. Ex. 1.

The Declaration of Dr. Clait Braun (Ex. 2) outlines his 40 year career studying, viewing, writing and teaching about, and passionately devoted to the Gunnison sage-grouse. Dr. Braun is a member of Rocky Mountain Wild ("RMW"). He has spent countless hours in the San Miguel Basin, observing grouse in the wild and contemplating ways to conserve the species. Dr. Braun's career focused on the Gunnison sage-grouse during employment with the Colorado Division of Wildlife and in conjunction with the United States Fish and Wildlife Service. Dr.

Braun plans to continue visiting the leased area for the purposes of observing the Gunnison sage-grouse and other scientific and recreational purposes.  Dr. Braun, like RMW and its other members, depend on federal laws such as NEPA and the ESA to provide information about agency actions and how they may impact environmental values.  Dr. Braun, like other RMW members, has been harmed by the BLM's failure to comply with these statutory obligations when leasing parcels in the San Miguel Basin in March 2017.  A Court order invalidating this leasing decision will remedy this harm.

Megan Mueller is Senior Staff Biologist and a member of Rocky Mountain Wild.  In her Declaration (Ex. 3), Ms. Mueller travels to the area as part of her work on Gunnison sage-grouse began in 2007.  RMW was involved in filing the ESA listing lawsuit in 2004.  She describes her own, and RMW's, extensive advocacy for the protection and conservation of the Gunnison sage-grouse and its habitat.  Ms. Mueller explains that NEPA and ESA compliance are central to the RMW's mission, its members understanding of government action, conservation of species in general, and that personally and organizationally participation in these processes has been a focus of their work.  Harms to Ms. Megan, RMW, the public lands, and wildlife are caused by BLM's failure to comply with environmental laws.  The uninformed decisions ignore available protections and allows traffic and other development activities that harm Gunnison sage-grouse and its habitat.  The reliance on a DNA instead of NEPA and ESA consultation harm her ability to advocate for conservation of the Gunnison sage-grouse.  Ms. Mueller has been to the San Miguel Basin, where these parcels have been leased, and plans to return.  A Court Order invalidating this leasing decision will remedy the harm experienced by her and RMW.

Mark Pearson is a member and the Executive Director of the San Juan Citizens Alliance ("SJCA"), in Durango, Colorado. Mr. Pearson's Declaration (Ex. 4) highlights his extensive

history of participating in administrative processes personally and on behalf of SJCA members

since 1999.  For the past 35 years Mr. Pearson has been hiking, camping, and watching wildlife

in the areas surrounding the March 2017 lease parcels and plans to continue to return to this area

in the years to come.  Mr. Pearson and SJCA participate in administrative processes aimed at

protecting the sensitive environmental values in the San Juan Basin, including the lands leased

by the BLM in March, 2017.  SJCA has participated in BLM's process of assessing and

designating Areas of Critical Environmental Concern ("ACEC") in the San Miguel Basin and

highlights how the March 2017 leasing decision will impact their ability to participate in and the

outcome of that ongoing process.  Mr. Pearson has witnessed, and is harmed by, the unmeasured

impacts of oil and gas development on natural environments and wildlife species in Southwest

Colorado and in the leased area.  Mr. Pearson explains how, like other SJCA members, his use

and enjoyment of this remote part of San Miguel County will be harmed by an uninformed

leasing decision that does not consider the full range of protections, including not leasing these

areas.  NEPA analysis, ESA consultation, NFMA compliance, and compliance with the Freedom

of Information Act ("FOIA") would have informed Mr. Pearson and SJCA so they could fulfill

their mission of informing elected officials, local government staff, members, and members of

the public of the impacts of this decision.  Use of the DNA prevented meaningful participation

throughout the leasing process.  Setting aside the DNA, Decision Record, and the leases would

be sufficient, but if additional equitable relief is also necessary, an injunction restricting BLM

actions and compelling legal compliance would also remedy the harm suffered by Mr. Pearson

and SJCA.

Luke Schafer is a member of and the West Slope Director for Conservation Colorado

("COCO").  Mr. Shafer's declaration (Ex. 5) highlights COCO's 40,000 members interest in

responsible management of BLM lands in Colorado and their involvement in decision-making processes as a way of advocating for protection and conservation of wildlife habitat, wilderness-quality lands, and other natural resources managed by the BLM.  Mr. Shafer has spent many days and nights in the area where the March 2017 parcels were leased.  He recalls pre-dawn walks through the sagebrush hoping to view the elusive Gunnison sage-grouse engaged in its mating dance. The activities allowed by the leases would harm Mr. Shafer.  Mr. Shafer participated in the leasing process that resulted in the March 2017 lease sale.  The lack of a site-specific hard look at the impacts of its leasing action resulted in creation of vested private rights in public lands that harms Mr. Shafer's and COCO's members' present and future interest in viewing the Gunnison sage-grouse in the wild.  Invalidating the leases - and providing other relief - would help assure Mr. Schafer, COCO can continue to influence BLM's land management activities, informed by statutorily mandated NEPA and ESA processes.

The Tenth Circuit has confirmed that the types of injuries involved in the present case are redressable and fairly traceable to the NEPA and ESA violations.  "[T]he alleged injury is the potential environmental impact of an uninformed decision [. . .]" and the "injury is redressable by a court order requiring the DOE to undertake a NEPA and ESA analysis in order to better inform itself of the consequences of its decision[. . .].  *Sierra Club v. US DOE*, 287 F.3d 1256, 1265-1266 (10th Cir. Colo. 2002) (setting aside actions and remanding for further proceedings).

In the present case, injuries to Plaintiffs' interests may be remedied by an order finding that compliance with federal law was not achieved before the Defendants made decisions and took action to implement those unlawful decisions; setting aside the offending agency decisions/actions; and remanding with instructions to comply with the substantive requirements of NEPA, the ESA, FLPMA, and other state and federal laws.  Plaintiffs respectfully submit that

the evidence provided in the Declarations and Administrative Record demonstrate standing to pursue judicial review and for this Court to grant effective judicial relief that holds unlawful and sets aside the BLM's leasing decision.

> ### B.    NEPA and FLPMA Claims are Justiciable

Jurisdiction to resolve the NEPA and FLPMA claims is established where this case involves review of agency actions that became final, ripe, and suitable for judicial review and remedy upon issuance of the Decision Record (BLM11311), Determination of NEPA Adequacy (BLM11225), and each of the challenged leases.  Like a FONSI that determines the parties' respective "rights and obligations," and foregoes preparation of an EIS, a DNA "is an action from which legal consequences flow." *Cure Land, LLC v. USDA*, 833 F.3d 1223, 1231-32 (10th Cir. 2016) (citation omitted).  "NEPA . . . simply guarantees a particular procedure, not a particular result. Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id. quoting Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737, (1998).

Without review of the failure to prepare a NEPA analysis, the disregard of FLPMA duties, and relief that sets aside these agency actions, BLM will continue implementing its oil and gas program using improper NEPA teiring in a manner that denies Plaintiffs' requests for NEPA analysis as both too early and too late whereby "cumulative effects analysis, including site-specific impacts, might never occur." *Colo. Envtl. Coalition v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1209 FN 23 (D. Colo. 2011).  BLM's leasing process violated NEPA and FLPMA.

C.      ESA Claims are Justiciable

Issuance of the typical federal oil and gas leases creates legal rights and triggers ESA obligations that satisfy the Article III ripeness doctrine. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149 (1967) (ripeness turns on "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration."). Oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold" and therefore would constitute an "irreversible and irretrievable commitment of resources" that triggers National Environmental Policy Act ("NEPA") duties and satisfies the ripeness inquiry. *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009).

The Tenth Circuit has confirmed that Article III ripeness analysis applied to NEPA claims also applies to ESA claims involving an agency's decision to grant a private interest in federal lands. *Sierra Club v. United States DOE*, 287 F.3d 1256, 1266 (10th Cir. 2002) (holding that DOE failure to comply with ESA procedures before granting a road easement was a final agency action ripe for adjudication and setting aside road easement). It is settled law that when BLM takes final action to issue a typical mineral lease, the agency action is ripe for judicial review. *Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1159 (10th Cir. 2013) (setting out an undeveloped field exception to general rule). This case involves typical leases that irretrievably commit resources and allow private use and occupancy of federal public lands. ECF No. 1 at ¶¶ 8-14.

The Administrative Record confirms the contested mineral leases affect Gunnison sage-grouse and its habitat by conveying an interest in federal land, allowing surface occupancy, increasing commercial use of BLM roads, intensifying activity in a region where oil and gas and

uranium development is ongoing, allowing activities that do not require additional approval, and foreclosing BLM's ability to prohibit development on these leases.  The leases are issued in an area that is already impacted by numerous producing oil and gas wells and non-producing leases. BLM09770-75, BLM09619.

 Moreover, like NEPA analysis, the pre-leasing ESA "consultation is more than a mere procedural requirement, as it allows [the U.S. Fish and Wildlife Service ("USFWS")] to impose substantive constraints on the other agency's action if necessary to limit the impact upon an endangered species." *N.M. ex rel. Richardson*, 565 F.3d at 700 (citations omitted).  Vacating the leases and remanding for USFWS consultation may result in a BLM decision to delay or forego leasing of the parcels, or if leases are issued, ESA compliance on remand would ensure analysis of the effects of the exploration traffic and the foreseeable development of the actual lease parcels in conjunction with the indirect effects of other federal and private projects.

Objections to this leasing decision were submitted by the U.S. Fish and Wildlife Service and Colorado Parks and Wildlife. ECF No. 1 at ¶¶86-88, BLM06389 (CPW Scoping Comments), BLM08580 (CPW DNA Comments), BLM08632 (USFWS DNA Comments). Importantly, BLM does not contest that issuance of a mineral lease is a final agency action. ECF No. 1 at ¶6 (issuance of "lease is a final agency action subject to immediate judicial review. BLM leases are justiciable when issued.").

The Tenth Circuit confirmed that mineral leasing is typically final agency action, ripe for judicial review, even though drilling permits (known as "APDs") will be required before drilling commences.

> It is true that in a typical mineral leasing case, environmental plaintiffs do not have to wait until drilling permits have been issued before they may bring suit. Federal courts have repeatedly considered the act of issuing a lease to be final agency action

> which may be challenged in court. […] In part this is so because the issuance of the lease represents the irreversible and irretrievable commitment of public resources for private use.

*Utah Wilderness Alliance, 707 F.3d at 1159 citing N.M. ex rel. Richardson v. BLM*, 565 F.3d 683; *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983). *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999). Although the drilling approvals remain, "[o]nce the lease is issued, the lessee 'cannot be prohibited from surface use of the leased parcel.'" *Id. quoting N.M. ex rel. Richardson v. BLM,* 565 F.3d at 718 (citing 43 C.F.R. § 3101.1-2).

Here, BLM used a truncated version of the three-tiered decisionmaking process to grant leases that create private interests in public lands. None of the leases contain a no surface occupancy ("NSO") provision and none of the leases retain the ability to invalidate the lease should ESA concerns preclude development. ECF No. 1 at ¶¶ 8-15. Yet, BLM made no attempt to ascertain the impact of the infrastructure, exploration activities, traffic, or use and occupancy of the lease tracts on the Gunnison sage-grouse, even though the oil and gas development in this area is one of the reasons the Gunnison sage-grouse receives ESA protections. *Id.* at ¶16 *accord* 79 Fed. Reg. 69311, 69255 (November 20, 2014) ("Energy development impacts sage-grouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence."), *see also Id. at 69308* ("Disturbance from roads and vehicular traffic near leks during the breeding season must be reduced and/or minimized. Road closures, seasonal timing restrictions, and proper siting of new roads should be used to eliminate or minimize disturbance.").

The ESA and FLPMA claims are ripe and redressible by favorable decision based on agency discretion, authority, and duties that can be exercised at the leasing stage, informed by NEPA and ESA consultation.  In a similar situation, relief was granted based on the agency "authority to close designated roads, trails, or areas if it determines that the use of these roads or trails is directly causing or will cause adverse effects on" the listed species or its habitat. *WildEarth Guardians v. United States Forest Serv.*, U.S. Dist. LEXIS 165337, at *39-40 (D.N.M. Aug. 30, 2018).  Based on the Forest Service discretion that was not analyzed, the court remanded the case for "immediate reinitiation of consultation on the effects of the Travel Management Decision on the Jemez Mountains salamander. *Id.* at *47 (D.N.M. Aug. 30, 2018). This Court could order reinitiation of the consultation completed at the programmatic RMP tier. However, it would be more efficient to consult when a site specific leasing decision "may affect" a listed species, in coordination with the three-tiered Mineral Leasing Act process.  Here, BLM has authority and discretion to impose NSO, controlled surface use ("CSU"), and timing stipulations, as well as other restrictions aimed at protecting the Gunnison sage-grouse.  The FLPMA duty to prevent UUD is also intertwined with ripeness, because it imposes a separate duty that BLM must satisfy before granting private rights in federal lands at the leasing tier.

The overlapping statutory claims in the present case are appropriate for judicial resolution.  BLM regulations and caselaw establish a three-tiered - plan, lease, and permit - process to guide BLM's implementation of the Mineral Leasing Act, but BLM skipped the ESA, FLPMA, and NEPA analysis that would inform BLM decisionmakers and Plaintiffs of the foreseeable effects of the irretrievable commitments of resources made at the leasing tier, including potential "take" of an ESA-protected species. *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (action agency and employees that disregard ESA duties and "who knowingly 'takes' an

endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Id. citing* 16 U.S.C. §§ 1540(a) and (b)).

## IV.    STANDARD OF REVIEW

Where a statute such as NEPA or NFMA does not provide a private right of action, the APA provides for judicial review of final agency actions. 5 U.S.C. § 701 et seq.. "Judicial review of both formal and informal agency action is governed by § 706 of the APA, which provides that a 'reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found' not to meet six separate standards." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413 n. 30 (1971) (citing 5 U.S.C. § 706(2)).

Agency action must be set aside if it fails to meet statutory, procedural or constitutional requirements or if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Am. Wildlands v. Browner*, 260 F.3d 1192, 1196 (10th Cir. 2001) (construing § 706(2)(A)-(D), the "generally applicable" standards).  These standards require the reviewing court to engage in a "substantial inquiry."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).  Any deference or presumption of regularity that may be given to agency action must "not [] shield [the agency's] action from a thorough, probing, in-depth review." *Id.*, quoted by *Olenhouse*, 42 F.3d at 1573-74 (footnotes omitted).  Agency decisionmaking and recordkeeping must be consistent with "basic concepts of fair play." *Olenhouse*, 42 F.3d at 1584, quoting *Garvey v. Freeman,* 397 F.2d 600, 612 (10th Cir. 1968).

Because the arbitrary and capricious standard "focuses on the rationality of the agency's decisionmaking process rather than on the rationality of the actual decision … the agency's

action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 1574, see also *Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Deference, if any is warranted, is to the agency's articulation in the administrative record of what the agency did, not arguments reconstructing what the agency might have done. *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943), *Michigan v. EPA*, 135 S. Ct. 2699, 2711 (2015). When interpreting a statute not administered by the agency, deference to the agency's position is inappropriate. *Park County Resource Council, Inc. v. United States Dep't of Agriculture*, 817 F.2d 609, 619-20 (10th Cir. 1987) (no deference to Forest Service's interpretation of NEPA), *overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992). The Court explained that agency "deference … is appropriate [only] when the disputed issue is one expressly delegated to an agency that deals exclusively with the area and so has refined an expertise in its nuances." *Park County Resource Council, Inc.,* 817 F.2d at 620. BLM possesses no special expertise in construing NEPA or the ESA, as NEPA is administered by the Council on Environmental Quality and ESA is administered by the Fish and Wildlife Service. *See Id.*

A recent Supreme Court decision affirms this approach. In *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018), the Court noted problems with deference to "[a]n agency eager to advance its statutory mission, but without any particular interest in or expertise with a second statute …." Recognizing that courts, not agencies, interpret laws and adjudicate agency compliance with federal laws, the opinion explained that "[t]o preserve the balance Congress struck in its statutes, courts must exercise independent interpretive judgment." *Id.* The Supreme Court's skepticism of these types of agency interpretations applies equally to the BLM's interpretations of NEPA and ESA here. NEPA does not implicate any special expertise of the

regulated agency; NEPA imposes a statutory duty (42 U.S.C. § 4332(2)(C)) to use NEPA's

procedural requirements to "prevent or eliminate damage" to the environment. *Ross v. FHA,* 162

F.3d 1046, 1051 (10th Cir. 1998).

The challenged ESA claim is brought based on ESA's citizen suit provision, 16 U.S.C. §

1540(g), whereby "private parties may enforce the substantive provisions of the ESA . . . ."

against the action agency that violates its ESA duties. *Bennett v. Spear*, 520 U.S. 154, 173 (1997)

(distinguishing ESA citizen suit claims against action agencies such as the BLM from

Administrative Procedure Act ("APA") claims against USFWS, the federal agency with

expertise in the ESA).

Before the District Court can fulfill its duty to review the parties' dispositive motions and

merits briefs in a case involving agency action, it "must have before it the 'whole record' on

which the agency acted." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).  The

"whole record" consists of "all documents and materials directly or indirectly considered by the

agency." *Id*. at 739. The administrative record certified by the agency provides a first step in

establishing the record, particularly in cases involving ESA claims that do not depend on the

APA for jurisdiction.  The ESA consultation claim is distinct from the APA claims, but turns on

a common set of facts that will be revealed by the Administrative Record required for review of

the APA-based NEPA and FLPMA claims. *Franklin Savings Ass'n v. Office of Thrift*

*Supervision*, 934 F.2d 1127, 1137-38 (10th Cir. 1991).

IV.    **ARGUMENT**

A.    **BLM Issued Leases for Specific Parcels without the Benefit of Lease-tier ESA Consultation**

BLM failed to meet its ESA consultation duties before taking "agency action," granting lease rights in federal lands that "may affect" the listed Gunnison sage-grouse. 16 U.S.C. § 1536. ESA "consultation is more than a mere procedural requirement, as it allows [USFWS] to impose substantive constraints on the other agency's action if necessary to limit the impact upon an endangered species." *N.M. ex rel. Richardson*, 565 F.3d 683, 700 (10th Cir. 2009). "As the § 7 regulations provide, in addition to direct impacts of the action, agencies must consider indirect and cumulative impacts as well as "interrelated and interdependent actions." 50 C.F.R. § 402.2. Consequently, courts have required agencies to consider all related impacts." *Sierra Club v. United States*, 255 F.Supp.2d 1177, 1188 (2002) United States District Court, (D. Colo. 2002) *citing Conner v. Burford,* 848 F.2d 1441, 1453-54 (9th Cir.1988) (requiring ESA consultation to address not only oil and gas leases, but also future exploration and development). Consultation should take place "early in the project development process and seek recommendations designed to minimize or avoid potential adverse affects to resources protected under the ESA." BLM00197. ESA-based jurisdiction over the leases and the merits of Plaintiffs' claim that the leases were issued without the required ESA consultation are therefore inextricably intertwined.

There is no question that oil and gas activities allowed by these leasees "may effect" Gunnison sage-grouse. The Administrative Record confirms that two expert agencies, USFWS and CPW, provided comments to BLM highlighting the impacts that "may effect" the grouse. (BLM08632) and CPW (BLM06388, BLM08579).

28

Despite evidence confirming leasing these tracts "may effect" Gunnison sage-grouse, no consultation was conducted at the leasing tier, and the effects on the grouse were not addressed in the Decision Record beyond a mere mention. BLM11313 (noting that "comments identified a variety of concerns about oil and gas leasing in general, Areas of Critical Environmental Concern, and Gunnison Sage Grouse related issues.").  BLM took the position that no consultation was required because the effects of oil and gas leasing were addressed when issuing a plan covering 634,654 surface acres and 2,686,994 acres of BLM-managed subsurface mineral estates. *Id*.  However, the BLM's protest response confirms Gunnison sage-grouse issues resulted in *ad hoc* deferrals, boundary adjustment of many parcels, and inclusions of parcels in the lease sale, without benefit of ESA consultation. BLM 11323-34 (removing and adjusting parcels based on Gunnison sage-grouse effects of leasing proposal based on 2016 Draft RMP Amendment).  Each position is addressed in turn.

> ## 1.    BLM Admits it did not Consult on the Leases that May Affect Gunnison Sage-Grouse

As an initial matter, BLM does not claim to have consulted with the USFWS when making its decision whether to lease parcels within the San Miguel Basin. This claim presents straightforward questions: 1) does leasing warrant a "may effect" finding; and, 2) did BLM consult on these parcels.  The answer to the second question is no, there was no lease-tier consultation on the effects of oil and gas leasing in the San Miguel Basin.

The first question is determinative of the ESA claim - leasing in the San Miguel Basin "may affect" Gunnison sage-grouse.  The "may affect" determination is supported by a letter from FWS that concludes the BLM should defer leasing due to the location of the parcels "adjacent to or in between areas of [Gunnison sage-grouse] critical habitat." BLM08632.  The

FWS letter (BLM08632-8636) does not contain a "may affect" determination, but articulates a number of activities and impacts that meet the low bar that triggers ESA consultation. "This "may affect" standard triggering the consultation requirement is low" and "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement...." *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1222 (D. Colo. 2011). The only roads accessing these parcels cut directly through designated critical habitat and within .6 miles of a lek. BLM10309, BLM06201 (maps showing road U-29).

Colorado Parks and Wildlife expressed concerns "about indirect disturbance to GUSG by drilling operations and increased noise and disturbance from increased truck traffic on existing and potential new roads through GUSG habitat." BLM08584. Again, these concerns were not addressed in any past analysis or in the leasing decisionmaking process. BLM cannot defer consultation until the permitting phase, as "take" may have already occurred during exploration, staking or other pre-permitting activities. Prior to submitting an Application for Permit to Drill, lessees will have to drive to the parcels, survey, explore, and determine future development plans; all of which "may affect" the Gunnison sage-grouse. Attaching the CO-34 (notice of ESA duties) as a lease stipulation does not cure this deficiency. BLM09847. A BLM Natural Resource Specialist confirmed this by stating "I think CO34 should be OK for Plan Maintenance because it basically reiterates the requirements under Endangered Species Act, doesn't create any new obligations." BLM02851. CO-34 is aimed at the discovery of an ESA listed species after leasing, not permission to delay consultation. The requirements under the Endangered Species Act, when impacts to a listed species are known, must be met early in the project planning process. BLM00197.

By failing to consult with the USFWS, Plaintiffs' interests, and the interests of their members, are harmed. Ex. 1-5, *esp* Ex. 2 (Braun Dec.).  Moreover, setting aside the leases provides the opportunity to remedy these harms based on best available science standards, and involvement of Plaintiffs and their members, who have both expertise and a continuing interest in protecting this area. *Id.*

## 2.    BLM Relies on Plan Level Consultation

BLM confirms that consultation was not conducted on these lease tracts during consideration of the proposed action, and instead relies on an array of Plan-level consultations, none of which address the specific characteristics and threats to the San Miguel Basin population. "The final approved LRMP [wa]s intended to be a dynamic document and would adopt the most recent versions of management direction agreed to *with the USFWS* for conservation of these species." BLM01611.  Future consultation with the USFWS was the means to determine how to conserve the San Miguel population of the Gunnison sage-grouse.  In fact, the Plan-level Conference Opinion (which was later accepted as a Biological Opinion) clearly states that "[a]t this programmatic level, we do not have sufficient information about where, when, or to what extent, actions may occur that may affect GUSG or its occupied critical habitat." BLM01410.  At the leasing stage BLM knows where BLM06199-6204 (Lease sale maps), when (10-year lease term, see e.g. BLM12057), and the extent (survey, exploration, and other pre-development activities) of this routine agency action.  The programmatic level consultation clearly assumed consultation on the impacts to the Gunnison sage-grouse would need to be analyzed at a later point in the decisionmaking process. BLM01414 (However, given the uncertainty of the timing, location, size, and extent of future actions it is not possible to

meaningfully predict adverse effects caused by implementation of the revised LRMP at this programmatic scale. All subsequent actions that affect GUSG will be subject to future section 7 analysis and consultation requirements...").  BLM ignored the established three-tiered decisionmaking process that takes nuances of oil and gas leasing into account. *Wilderness Workshop*, 2018 U.S. Dist. LEXIS 178506, at *7 (D. Colo. Oct. 17, 2018) (explaining that "Department of Interior policy mandates additional review" at the leasing stage).

 BLM cannot again defer its ESA duties, because "[a]ny possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement...." *Colo. Envtl. Coal. v. Office of Legacy Mgmt*., 819 F. Supp. 2d 1193, 1222 (D. Colo. 2011).  NSO and CSU stipulations, among other alternatives, are precisely the type of beneficial effects that BLM ignored before issuing these leases.  These beneficial actions were recognized as important components that were noted and required by the ongoing Gunnison Sage-Grouse RMP Amendment Process.

### 3.    BLM Gunnison Sage-Grouse RMP Amendment.

The USFWS listing decision identified the lack of adequate regulatory mechanisms in BLM Resource Management Plans as a major threat that contributed to the need for the Gunnison sage-grouse to be protected as threatened under the ESA. 79 FR 69277.  In response to this finding of inadequate regulatory mechanisms for BLM lands and minerals, the Colorado and Utah BLM have begun, but have not completed, a range-wide RMP Amendment process for Gunnison sage-grouse habitat.  The "plan amendment is necessary to address the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as "threatened" under the Endangered Species Act." BLM06601.

Among a variety of other conservation measures for Gunnison sage-grouse, the Draft GRPA is considering additional lease stipulations, areas open to leasing, and other conservation measures to protect Gunnison sage-grouse from oil and gas development that may apply to or impact the parcels at issue here, and that were not considered in the Tres Rios RMP/FEIS. BLM07493. The USFWS "recommend[ed] deferral of parcels adjacent to occupied critical habitat…until the BLM GUSG plan amendment process is finished. It is possible that GUSG protections will be identified in the plan amendment that are not currently contained within the Tres Rios RMP, and, therefore, not currently applied to any parcels currently under consideration for leasing." BLM08632. A BLM Natural Resource Specialist pointed out that Gunnison sage-grouse protections "will be covered better when the GuSG Amendment comes out…" BLM02852. Had BLM waited until this amendment process was complete, increased protections may have attached to these parcels or they would be precluded from leasing.

For purposes of this litigation, the Draft GuSG identified the plan-tier inadequacies, need for this amendment to the Tres Rios Field Office RMP, the need for further consultation and the inadequacy of the NEPA analysis of impacts to the Gunnison sage-grouse based on the inadequate plan-tier ESA consultation. Leasing these parcels while the RMP amendment process is ongoing, without conducting site specific consultation *that also cures the plan-tier inadequacies*, would unlawfully approve "an adverse environmental impact" and "limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2).

> **4.    Analysis of Foreseeable Effects Cannot be Delayed Until Post-Leasing Consultation**

As set out more completely below, the rational that prohibits promises of future NEPA compliance also precludes BLM from relying on promises of future ESA consultation. *Sierra*

*Club*, 255 F. Supp. 2d at 1186 (holding issuance of road easements for mine access arbitrary and capricious when it preceded NEPA and ESA compliance).  Two expert wildlife agencies cautioned the BLM about leasing these parcels.  BLM08632, BLM06388, BLM08579.  Instead of analyzing the concerns voiced by these agencies, the BLM dismissed these concerns and pushed forward with its leasing decision.  BLM should have taken a hard look at these reasonably foreseeable effects through the NEPA process informed by its consultation with FWS pursuant to the ESA.  Alternatively, BLM could have requested re-initiation of the past programmatic consultation.

An order setting aside the leases and entering findings ensuring compliance with these statutory processes would result in better information, address Plaintiffs' interests in the Gunnison sage-grouse,  and as Congress intended, a decision consistent with the Congressional intent that ESA-listed species "be afforded the highest of priorities." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173-74 (1978).

### B.      National Environmental Policy Act Claims

BLM's decision to use a DNA form instead of lease-tier NEPA analysis is both similar and distinct from reliance on an EA/FONSI instead of an EIS analysis at the lease-tier.

An EA follows NEPA's procedural mandates by presenting a draft document with interdisciplinary analysis and a comparison of alternatives that solicits public comment to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary." 40 C.F.R § 1508.9(a)(3) (definition of "environmental assessment").  BLM's decision to forego lease-tier NEPA analysis based on the DNA, like the decision to forego an EIS based on an EA/FONSI, is a final agency action that terminates the NEPA process. "DNAs are forms designed to allow BLM employees to determine whether they properly can rely on existing

NEPA documents." *Pennaco*, 377 F.3d at 1152.  A DNA, like an EA/FONSI, has "substantive component with respect to the ultimate conclusion of no significant impact as well as a review of the agency's procedural compliance." *San Luis Valley Ecosystem Council*, 657 F. Supp. 2d 1233, 1243 (D. Colo. 2009), *Id. citing Davis v Mineta*, 302 F.3d at 1112.  The similarities warrant substantive and procedural inquiry into the DNA. *Id.*

Unlike an EA/FONSI - a NEPA document that addresses the agency's NEPA duties (40 C.F.R § 1508.9) - the DNA is a mere form used to terminate the NEPA process without preparation of a NEPA document that could meet the agency's NEPA duties. *Pennaco*, 377 F.3d at 1152.  A DNA is not an "environmental document" that can be relied upon to meet the agency's NEPA interdisciplinary analysis, comparison of alternatives, or public participation duties. *Id.* at 1162 *citing* C.F.R. § 1508.10 (defining the term "environmental document" as including environmental assessments, environmental impact statements, findings of no significant impact, and notices of intent).  In short, the DNA is "an administrative convenience created by the BLM" that cannot fulfill the agency's unmet NEPA duties. *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1263 (D. Utah 2006) (setting aside leases issued based on DNA forms).

By failing to prepare a NEPA document addressing the impacts and alternatives revealed by the location of the specific tracts, a factor that did not exist at the RMP tier, BLM has violated the dual purposes of NEPA: informed decisionmaking and public participation. *Id*. The specific violations are set out in turn. First, BLM's reliance on the DNA instead of lease-tier NEPA analysis is addressed, followed by the consequences of BLM's decision, which include failure to analyze lease-tier alternatives, purpose and need, and NEPA's hard look mandates. The last subsection highlights the significant impacts that warrant remand for preparation of an EIS.

1. **BLM Issued Leases without Preparing Lease-tier NEPA analysis.**

BLM did not prepare a lease-tier NEPA analysis. BLM instead prepared a DNA form. BLM11225-308. Although the DNA is a form, the administrative record confirms BLM engaged in extensive non-NEPA procedures to avoid preparation of an EA or EIS. The extraordinary lengths BLM took to avoid NEPA analysis is somewhat understandable, but clearly unlawful, in context of the Tenth Circuit's recent confirmation that NEPA documents (EAs and EISs) are not mere paperwork exercises.

> In NEPA, Congress codified rules designed to focus both agency and public attention on the environmental effects of proposed actions and thereby facilitate informed decisionmaking by agencies and allow the political process to check those decisions.

*Audubon Soc'y of Greater Denver v. United States Army Corps of Eng'rs*, U.S. App. LEXIS 31227, at *3 (10th Cir. Nov. 5, 2018) *quoting WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (quotation marks and alterations omitted). Although the motive appears to be bureaucratic, "[u]ltimately, when reviewing for NEPA compliance, [courts] look to whether the agency performed the NEPA analysis on the subject action." *All. for the Wild Rockies v. United States Forest Serv.*, No. 16-35829, 2018 U.S. App. LEXIS 30151, at *30 (9th Cir. Oct. 25, 2018) citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999). BLM did not perform a NEPA analysis.

BLM cannot point to any substantive NEPA analysis in the Administrative Record that informs the decisionmakers, the public, and the political process of the impacts, alternatives, and mitigation measures involved with leasing these particular tracts of federal land for oil and gas production. Importantly, the pleadings confirm that "BLM did not analyze the current access to

these parcels or the increased impacts of accessing these parcels to allow for oil and gas development." ECF No 1 at ¶62 (admitted).

The narrow scope of the RMP EIS was explicitly laid out in context of the Gunnison sage-grouse.

> The Biological Assessment (BA) of impacts of the proposed RMP to Gunnison sage-grouse has not been done in time to inform the NEPA review. The BLM intends to publish the BA with the LRMP ROD, and states that "the ROD will include information to ensure this FEIS analysis is consistent with the accepted BA by the USFWS" […]

BLM11353, BLM01610 ("Formal consultation under Section 7 of the ESA for BLM lands is ongoing as of the publication of this FEIS, and the BLM BA will be published with the LRMP ROD."). BLM cannot assert the environmental impacts of leasing on Gunnison sage-grouse was addressed at the RMP-tier, when the necessary analysis of impacts – here the analysis of impacts on Gunnison sage-grouse contained within the BA and BO - had not been done in time to inform the RMP NEPA review. *Id*. The RMP recognized that the leasing program "may affect, and is likely to adversely affect" Gunnison sage-grouse and proposed critical habitat. BLM01619. BLM assumed that future analysis "would result in a better understanding of conservation measures to benefit the species." BLM01611. BLM leased the parcels without preparing additional NEPA analysis.

This is not a case where there is a factual dispute over whether BLM conducted detailed NEPA analysis that can be used to inform the decision on whether to lease specific parcels that will impact Gunnison sage-grouse habitat. The Gunnison sage-grouse NEPA analysis at the RMP tier was inadequate (BLM01610-11, BLM11353), and no NEPA analysis was conducted at the leasing tier. The Administrative Record confirms the DNA is arbitrary, capricious, and contrary to law.

The DNA does not identify any portion of the RMP EIS that addresses the site-specific impacts of leasing these particular tracts. BLM11229- 30.  Instead, in the RMP Protest Response, BLM confirmed the RMP-tier EIS was deliberately narrow in scope, and therefore cannot be used for site-specific projects.

> As articulated in Section 3.1 of the LRMP, "this FEIS is a programmatic document. It discusses environmental effects on a broad scale and does not predict what would happen when such broad-based standards and guidelines are implemented on an individual, site-specific project, nor does it convey long-term environmental consequences of any site-specific projects."

BLM001169.  Similarly, the pleadings confirmed that "BLM did not analyze the current access to these parcels or the increased impacts of accessing these parcels to allow for oil and gas development."  ECF No 1 at ¶62 (admitted).

Relegating reasonably foreseeable impacts from pre-leasing analysis for examination at a later date is prohibited. "Although Defendants' assurances of future NEPA review possess a certain pragmatic appeal, such assurances cannot obviate the need for compliance with NEPA regulations." *Sierra Club*, 255 F. Supp. 2d at 1186 (holding issuance of easements for mine access arbitrary and capricious when it preceded NEPA compliance); *High Country Conservation Advocates v. United States Forest Serv*., 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014) ("If site-specific analysis was to be postponed, then it should have been performed at a later opportunity. It makes no sense for the agency to then turn around and 'tier' their analysis to an early analysis that never took place.").

BLM's promise to look at lease-tier effects and options at the later drilling stage is contrary to law. *Id.*  BLM's leases are properly cancelled based on the shell game inherent in BLM's use of a DNA (BLM11229-30), that claims those effects and options were already addressed in an RMP-tier EIS that disavowed analysis of any "site-specific project."

BLM001169.  When the three shells are lifted, each are empty: 1) lease-tier analysis informed by lease location and Gunnison sage-grouse listing was not conducted at the RMP tier; 2) BLM did not conduct a lease-tier NEPA analysis; and, 3) it will be too late to carry out lease-tier NEPA analysis once the leases are issued and vested rights are created.  Effective relief should set aside the DNA, Decision Records, and the leases. This relief is necessary because "[o]nce the lease is issued, the lessee 'cannot be prohibited from surface use of the leased parcel.'" *N.M. ex rel. Richardson,* 565 F.3d at 718 citing 43 C.F.R. § 3101.1-2.

## 2.     BLM Failed to Examine Reasonable Lease-Tier NEPA Alternatives

BLM's three tiered decisionmaking was adopted to integrate the agencies mandatory NEPA duties with the discretionary decisions to designate regions of public lands available for leasing, followed by the decision to actually sell mineral leases in specific locations. *Pennaco*, 377 F.3d at 1151. Until BLM "acts to issue the lease, the applicant has only a 'hope or . . . expectation of a lease' and not a vested right." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).  NEPA's analysis of a range of alternatives is essential to guide BLM discretion and duties, before leasing creates vested private mineral rights in the federal public lands. *Id*. Here, the DNA identifies the proposed action.

> Twenty parcels were nominated for offering at the March 2017 Oil and Gas Lease Sale. […] Under the proposed action, five full parcels and eight partial parcels, totaling 9,093.38 acres from the twenty parcels that were nominated have been recommended for deferral in order to allow for additional review of appropriate protections for cultural resources, Gunnison Sage Grouse habitat, and relevant and important values for proposed Areas of Critical Environmental Concern (ACECs) from oil and gas development.

BLM11227-8.  The proposed action trigger's BLM's NEPA duties.

> Under NEPA, federal agencies must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible

official on," in relevant part, the environmental impact of the proposed action and alternatives to the proposed action.

*Wilderness Workshop v. United States BLM,* 2018 U.S. Dist. LEXIS 178506, at \*3 (D. Colo. Oct. 17, 2018) quoting 42 U.S.C. § 4332(C)(i), (iii).  There is no NEPA analysis of the proposed action in the administrative record, although BLM did take action to defer many parcels, and include others.  BLM11227-8.

An agency's consideration of a reasonable range of alternatives and comparison to the proposed action is the heart of the NEPA process, and must be considered before leasing.  *N.M. ex rel. Richardson*, 565 F.3d at 709.  To comply with NEPA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b).  The alternatives analysis necessarily includes "[o]ther reasonable courses of actions" as well as mitigation measures not in the proposed action.  40 C.F.R. § 1508.25(a); 40 C.F.R. § 1508.25(b)(2)-(3).  The agency's treatment of alternatives must be "substantial" and present impacts of alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public."  40 C.F.R. § 1502.14.

To determine the reasonableness of an agency's alternatives analysis, a reviewing court uses two guideposts:

> First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*N.M. ex rel. Richardson,* 565 F.3d at 709 (citation omitted).  Agencies may not, however "define the project so narrowly that it foreclose[s] a reasonable consideration of alternatives [sic]."  *Utah*

*Envt'l. Cong. v. Bosworth,* 439 F.3d 1184, 1195 (10th Cir.2006) *quoting Davis,* 302 F.3d at

1119.  "The existence of a viable but unexamined alternative renders the [NEPA analysis]

inadequate." *Natural Desert Ass'n v. Bureau of Land Management,* 531 F.3d 1114 at 1121 (9th

Cir. 2008) (citations omitted) quoted by *Dine Citizens Against Ruining our Environment*, 747

F.Supp.2d at 1256 (alternatives analysis is "at the heart of the NEPA process, and is operative

even if the agency finds no significance environmental impact")*.*

　　　BLM's instruction manual recognizes a long list of alternatives that are not made at the

RMP or the permitting phase, and encourages leasing based on a Master Leasing Plan within the

NEPA process to address "in-field conditions […] potential resource conflicts and environmental

impacts, […] mitigation strategies, and […] prohibiting surface occupancy or closing areas to

leasing."  BLM00238.  Although Master Leasing Plans are a BLM administrative tool, it is a

means BLM has outlined to ensure the agency would meet its duty to carry out lease-tier "NEPA

analysis" before issuing leases in a specific location.  BLM00239.  In the absence of a Master

Leasing Plan and accompanying NEPA analysis, the "lease parcel review" must "be conducted

and documented simultaneously with the NEPA compliance process" for the proposed lease

tracts. BLM00239.  Before leasing the parcels at issue, BLM did not use an RMP or Master

Leasing Plan NEPA process informed by in-field conditions to consider any of the alternatives

identified in the Instruction Manual.

　　　The Master Leasing Plan is not mandated by statute or regulation, but the Instruction

Manual provides record evidence confirming that BLM knows the public participation

component of NEPA alternatives analysis cannot be achieved without preparing a NEPA

document, subject to public comment, that compares the lease-tier alternatives and mitigation

measures based on the in-field conditions of the lease tracts. *Audubon Soc'y of Greater Denver*

*v. United States Army Corps of Eng'rs*, U.S. App. LEXIS 31227, at *3 (10th Cir. Nov. 5, 2018)

(NEPA requires public disclosure). 40 C.F.R. § 1502.14 (comparing alternatives "sharply

defin[es] the issues and provid[es] a clear basis for choice among options by the decisionmaker

and public.").

BLM's Instruction Manual confirms that, despite the RMP EIS, "[m]ost parcels that the

field office determines should be available for lease will require site specific NEPA analysis."

BLM00242.  Available alternatives at the lease tier include a determination that leasing is not

appropriate, leasing would require an RMP amendment "before leasing is appropriate," or

recommendations that the leases be offered with stipulations and terms tailored to the site

specific conditions of the lease tract. BLM00242.  BLM exercised its discretion and issued

leases, but did so without site-specific NEPA analysis of a range of reasonable alternatives.

### a.   NSO, CSU, and Other Infrastructure Alternatives were not Analyzed

BLM's RMP-tier EIS, which broadly addresses types of disturbances without regard to

location, is inadequate to support the issuance of leases, "[b]ecause location, not merely total

surface disturbance, affects habitat fragmentation." *N.M. ex rel. Richardson v. BLM,* 565 F.3d

683, 707 (10th Cir. 2009).  Lease-tier decisions, for the first time in BLM's three-tier process,

establishes the location of the leased parcels.  Beyond foreseeable, these known locations reveal

a range of alternatives to minimize direct, indirect and cumulative impacts that, if not addressed

at leasing, may avoid analysis at the permit-to drill stage. *Colo. Envtl. Coal. v. Office of Legacy

Mgmt.*, 819 F. Supp. 2d 1193, 1209 n.23 (D. Colo. 2011) (noting that by delaying site-specific

analysis of leasing a "thorough cumulative effects analysis, including site-specific impacts,

might never occur.).

The RMP addressed matters that span the millions of acres in the planning area, but did not look at alternative means to avoid, mitigate or minimize the impacts of leasing on Gunnison sage-grouse informed by the location of the proposed leases. The RMP-tier alternatives involve "standard" lease stipulations, many of which were issued for these leases, but merely restate existing law. The "standard" stipulations are not required for every lease because BLM generally cannot foresee the lease locations at the RMP tier. For this lease sale, twenty lease tracts were proposed. BLM11227. Seventeen leases were offered, including the ten challenged here, all of which are in or near Gunnison sage-grouse habitat, near ACECs, and near rivers. BLM 112228. However, there were also seven leases issued at the other ends of the planning area that required a different set of stipulations. BLM11234 (map), BLM 11241-BLM11265 (listing variety of standard stipulations applied to each parcel).

For the ten leases Plaintiffs seek to set aside, BLM chose to include a different set of "standard" lease stipulations for each lease, without first informing itself and the public through a NEPA process linked to these specific lease tracts. In short, a range of alternatives were internally considered and adopted based on "standard" stipulations, without benefit of NEPA analysis of the lease tracts. *Id.*

Location is also critical to see if BLM should go beyond the "standard" lease stipulations to impose lease stipulations specific to the Gunnison sage-grouse, ACECs, or other unique features of these parcels. The RMP EIS confirmed BLM must apply standards and guidelines to the site-specific conditions on lease tracts, because those locations were not addressed at the RMP-tier of decisionmaking.

> For new lease or new development areas, new mineral development facilities should be collocated and/or centralized. Facilities include roads, well pads, utilities, pipelines, compressors, power sources, fluid storage tanks, and other associated

equipment. Collocation of wells (more than one well per pad) should be required where feasible.

BLM00551. The DNA identifies no NEPA analysis of these alternative facilities in the RMP, and no NEPA analysis was conducted for these new leases.

Further, BLM admitted it "has not analyzed nor compared alternative means to access the parcels" it leased in the 2017 lease sale. ECF No. 1 at ¶63 (admitted).  Although the need to access these parcels is certainly foreseeable, the DNA identifies none of the existing road and infrastructure systems that may be used to access these lease parcels, let alone alternatives that could minimize impacts. BLM11225-308. BLM's administrative record also does not consider lease stipulations for these parcels, such as directional drilling from a central pad outside Gunnison sage-grouse habitat that could lessen the impacts. A NEPA violation is established by BLM's failure to use NEPA analysis to compare alternative locations and mitigation measures for roads and infrastructure to serve these new lease parcels in light of the status of existing leases issued before 2017 that can only be discerned by examining maps in the administrative record.  BLM09770-75 (BLM Maps); BLM09619 (San Miguel County Map also identifying critical habitat).

BLM also issued six leases issued in 2018 "within the same geographical locations as those challenged in this" litigation. ECF No. 1 at ¶67 (admitted).  While those claims are subject to separate litigation (San Miguel County v. BLM, 18-cv-01643-RPM), the use of multiple lease sales based on DNAs, with no lease-tier NEPA analysis to address NSOs, CSU infrastructure location, centralization, or other non-standard lease stipulations, confirms that BLM has systematically segmented its actions to avoid NEPA's requirement that agencies disclose and analyze the full range of alternatives available at the lease-tier of its decisionmaking process.

44

*N.M. ex rel. Richardson*, 565 F.3d at 708 (requiring NEPA analysis of habitat fragmentation impacts in a supplemental EIS).

In short, the Department of Interior has adopted a three-tier decisionmaking process that recognizes BLM's NEPA analysis must address alternatives that become known only after the location of specific leases are known. *Id.* Despite the mandate that NEPA analysis be carried out based on the facts that are foreseeable or known to the agency before taking action, BLM unlawfully issued each of the ten leases without conducting site-specific NEPA alternatives analysis.

### b.    No Action Alternative was not Analyzed

NEPA requires consideration of a no action alternative, which "compare[s] the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001). The DNA does not contain a no action alternative. BLM11225-308. Although "the absence of a detailed No Action analysis by itself does not render" an Environmental Analysis and FONSI arbitrary or capricious, a plaintiff may in some circumstances demonstrate that a no action alternative is required. *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1274-5 (10th Cir. 2013). Here, the RMP EIS did not contain the lease locations required to analyze "no action" at the lease tier, and there is no leasing EA or EIS to contain the lease-tier "no action" analysis.

Courts have regularly concluded "that agencies violated NEPA by issuing oil and gas leases without considering the no-action alternative." *S. Utah Wilderness All.* v. *Norton*, 457 F. Supp. 2d 1253, 1263 (D. Utah 2006*) citing Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228-30 (9th Cir. 1988) (BLM and Forest Service violated NEPA by failing to consider no-

action (no leasing) alternative); *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1145-46 (D. Mont. 2004) (BLM violated NEPA by failing to consider no-action alternative).

Here, BLM's original leasing proposal included parcels that were later altered or removed from the potential lease sale, confirming that site-specific conditions did indeed warrant no action. BLM06491-500.  Indeed, FWS (BLM08632) and CPW (BLM06388, BLM08579) recommended no action by deferring these parcels from leasing. Without any NEPA analysis, BLM acted to defer leasing some of the parcels included in the proposed action, confirming a "no action" alternative is viable.  Although BLM may use "non-NEPA procedures to determine whether new NEPA documentation is required," BLM unlawfully used a DNA to avoid NEPA documentation of the "no action" alternative for twenty (BLM11227-8) proposed lease tracts BLM deferred, adjusted, and issued leases. *Pennaco*, 377 F.3d at 1162.

BLM may argue it issued the DNA to conduct a non-NEPA "no action" analysis, but that will merely confirm that NEPA analysis of lease-tier "no action" is both viable and necessary due to the location of these lease tracts among ACECs and Gunnison sage-grouse habitat. *N.M. ex rel. Richardson,* 565 at 708 (finding that internal analysis confirmed NEPA analysis is viable and necessary).  The Administrative Record contains no evidence a NEPA analysis that could meet the requirement that "the current level of activity is used as a benchmark" for a no action analysis. *Custer Cty. Action Ass'n*, 256 F.3d 1024, 1040 (10th Cir. 2001).  Instead of informed decisionmaking and NEPA analysis of the proposed action informed by a no action alterative, BLM used a horse-trading approach to include, alter, and exclude twenty proposed parcels from the lease sale.  BLM11227-28.

Here, BLM failed to use NEPA procedures to analyze a no action alternative in a publicly available NEPA document and to present "no action" to the decisionmakers as a viable option.

*Id.* There is no evidence in the Record that more oil and gas leasing on federal public lands is necessary.  This NEPA violation warrants invalidation of the DNA, Decision Record, and leases, accompanied by a remand directing BLM to act in accordance with the findings in any such order.

### 3.    Purpose and Need for these Lease Tracts was Never Identified.

The purpose and need defines the scope of the NEPA analysis. 40 C.F.R. § 1502.16; *see also* 40 C.F.R. § 1502.1.  A reviewing court evaluates an agency's defined purpose and need for reasonableness. *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).  Agencies are forbidden from defining a "project's purpose in terms so unreasonably narrow as to make the [NEPA analysis] 'a foreordained formality.'" *City of Bridgeton v. FAA,* 212 F.3d 448, 458 (8th Cir. 2000) *quoting Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir.1991), *cert. denied* 502 U.S. 994 (1991) *citing Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997); *see also Colorado Environmental Coalition*, 185 F.3d at 1175.

Properly construed, the purpose and need section of a NEPA document briefly describes the purpose and need to which the agency is responding with its range of alternatives, and helps identify impacts and scope of analysis. 40 C.F.R. § 1502.16; *see also* 40 C.F.R. § 1502.1.  The importance of a legally compliant purpose and need is underscored by the fact that it is this statement that necessarily dictates the range of alternatives the agency considers in its environmental analysis.  *Davis*, 302 F.3d at 1119; *Colorado Environmental Coalition*, 185 F.3d at 1175.  Accordingly, agencies are required "to take responsibility for defining the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes." *See Davis*, 302 F.3d at 1118-1120.  BLM's NEPA Handbook further emphasizes

these NEPA requirements by definitively requiring that for externally generated actions—such as a proposed oil and gas exploratory well—that BLM is required to describe the BLM purpose and need, not the applicant's purpose and need.  Dep't of Interior, <u>BLM National Environmental Policy Act Handbook H-1790-1 35</u>[5] *citing* 40 C.F.R. § 1502.13.

There is no lease-tier NEPA document setting out BLM's purpose and need to offer any of the ten leases, or these lease tracts as a package with other leases, rendering its leasing decisions arbitrary, capricious, and contrary to law.

### 4.    The Location of the Lease Tracts Reveals Significant Impacts that Require Analysis in an Environmental Impact Statement

Once it is established that lease-tier NEPA documentation was not prepared, the question becomes what type of NEPA analysis is required, an EA or EIS.  This Court may, on the Administrative Record, remand based on findings that confirm an EIS is required due to "significant impacts" that became foreseeable when these lease tracts were issued, and which were not analyzed in a NEPA document. *San Luis Valley Ecosystem v. United States Forest Serv.*, 2007 U.S. Dist. LEXIS 36242, at *36 (D. Colo. May 17, 2007) (entering findings of fact and law, and remanding for "purposes of preparing an EIS").  This is not a case where site specific APD level development plans are needed to reveal impacts, development anywhere on the parcels and merely accessing the parcels creates foreseeable impacts.

An Environmental Assessment and FONSI ("EA/FONSI") may only be used when agency action "will not have a significant effect on the human environment." *Utah Shared Access Alliance*, 288 F.3d at 1213.  Regardless of whether an agency uses a single NEPA process

---

[5] Handbook available at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.24487.File.dat/%20h1790-1-2008-1.pdf.

or a tiered NEPA process, the agency must examine the significance of the entire proposed

project. 40 C.F.R. § 1508.27.  This inquiry requires an analysis of both context and intensity and

when this analysis concludes significance is present, the agency must prepare an EIS. 40 C.F.R.

§ 1508.27.  The context prong requires federal agencies to analyze different contexts, "such as

society as a whole (human, national), the affected region, the affected interests, and the locality."

40 C.F.R. § 1508.27(a).  For site-specific actions, significance is determined by looking at short-

and long-term effects and what those effects will be on the locale. *Id.*

The intensity prong goes to the severity of the impacts.  40 C.F.R. § 1508.27(b).  In

conducting this analysis, agencies are directed to look at ten different factors:

> (1) beneficial and adverse impacts;
> (2) effect on public health and safety;
> (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;
> (4) the degree to which the effects are likely to be highly controversial;
> (5) the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks;
> (6) the degree to which the action may establish a precedent for future actions;
> (7) whether the proposed action is related to other actions that individually have insignificant impacts but cumulatively significant impacts;
> (8) the degree to which the action may adversely affect districts, sites or other places listed or eligible for National Register of Historic Places or may cause destruction or loss to significant scientific, cultural, or historical resources;
> (9) the degree to which the action may adversely affect threatened or endangered species or established critical habitat; and
> (10) whether the action threatens to violate Federal, State, or local law or requirements imposed to protect the environment.

40 C.F.R. § 1508.27(b)(1)-(10).  The presence of one such factor may be sufficient to deem the

action significant and require the preparation, analysis, and disclosure of an EIS. *Nat'l Wildlife*

*Fed'n v. Norton*, 332 F. Supp. 2d 170, 181 (D.D.C. 2004).  Significance does not require

absolute certainty that significant impacts will result, rather it is enough that a proposed action

*may* result in a significant environmental impact. *Id. citing Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002).

These factors were not addressed in the DNA, but the evidence in the administrative record supports a finding that an EIS is required.[6] *San Luis Valley Ecosystem Council*, 2007 WL 1463855, *9-10 (directing preparation of an EIS based on finding unique geological features and prime fishing shoreline as unique characteristics in the geographical area of which the proposal would or may have a significance impact upon).

The Administrative Record provides substantial evidence of the unique characteristics, highly uncertain, unique, and unknown risks, as well as great controversy over the environmental effects of the challenged action. 40 C.F.R. § 1508.27(b)(3)-(5). The uniqueness and scientific controversies are confirmed by the recent decision upholding the Gunnison sage-grouse listing as threatened, and designation of critical habitat. *Colorado v. United States Fish & Wildlife Serv.*, 2018 U.S. Dist. LEXIS 166422, at *3-4 (D. Colo. Sep. 27, 2018).  The area is rich with proposed and designated Areas of Critical Environmental Concern, some of which may be excluded or altered by this lease sale. BLM09950-59 (San Miguel County Protest).  The historic and cultural resources in this area are known worldwide, and are important to many Tribes and Pueblos.

> Cultural resources associated with the Archaic, Ancestral Puebloan, and Historic Periods are known to exist within the lease parcels.  The most common sit types present in the lease parcels are open camps with lithic scatters of unknown prehistoric or protohistoric cultural affiliation.  Sites associated with Archaic, Formative, and Historic Periods are found in lesser numbers.

BLM06476.

---

[6]Alternatively, in conjunction with setting aside the leases, any order could include findings on the facts of this case that confirm BLM's duty to apply these criteria in an EA, and caution against predetermined use of an EA/FONSI.

For Example, BLM staff confirmed that the "Gypsum Valley ACEC does share lands with Parcel 7792 […]." BLM11309. Without NEPA analysis, staff argued that "[t]his ACEC is open to oil and gas leasing, and has specific analysis in the current RMP, which is not the same situation as the various Proposed ACECs under analysis in the current RMP ACEC Amendment." *Id*. After internal debate, the parcel was included "in the March 2017 Lease Sale." *Id*. The internal dispute over the inclusion of Parcel 7792 is illustrative of an administrative record that confirms that ACECs provide a reasoned basis for excluding a parcel from a lease sale, and several tracts were indeed excluded on this basis. *Id*. However, an email dispute disclosed in litigation cannot serve the NEPA purpose and "allow the political process to check those decisions." *Audubon Soc'y of Greater Denver v. United States Army Corps of Eng'rs*, U.S. App. LEXIS 31227, at *3 (10th Cir. Nov. 5, 2018). The email does confirm significance criterion that warrant preparation of an EIS. 40 C.F.R. § 1508.27(b).

A proposed agency action is highly controversial and thus requires EIS review if there is a "substantial dispute" about the "size, nature, or effect" of the proposed action. 40 C.F.R. § 1508.27(b)(4); *Blue Mts. Biodiversity Project*, 161 F.3d at 1212; *Native Ecosystems Council*, 428 F.3d at 1240. Where the environmental effects of a proposed agency action are highly uncertain or involve unique or unknown risks, an agency is not absolved of its duty to conduct an EIS where the EA lacks supporting data and provides a cursory treatment of environmental effects, or where further data collection may prevent speculation about potential effects. *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213-14 (9th Cir. 1998).

Although controversy is present where there is an inter-agency dispute, such as the dispute between BLM and the expert wildlife agencies, controversy has also been found in other circumstances, such as when over 85% of comments raised concern an agency's conclusion that

a project will not significantly affect the environment and where an agency was presented with scientific evidence evaluating the environmental effects of a proposed project or that called into question the adequacy of the EA. *Nat'l Wildlife Fed'n*, 332 F. Supp. 2d at 184-85 *citing Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001); *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988); *Friends of the Earth, Inc. v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000); *Blue Mountains Biodiversity Project*, 161 F.3d at 1213.

Issuing these leases sets a precedent for future land management designations (e.g. ACEC's) and are related to the ongoing issuance of leases in this area that have cumulatively significant impacts. 40 C.F.R. § 1508.27(b)(6-7).  A separate, but related case is going forward on leases issued nearby with similar impacts. *San Miguel County v. BLM*, 18-cv-01643-RPM. There are an unspecified number of existing leases, some of which are producing, and others which are not in production for unspecified reasons. BLM09770-75, BLM09619.

As set out more fully in the ESA section above, the leases, individually and cumulatively with other leases, "may adversely affect threatened or endangered species or established critical habitat." 40 C.F.R. § 1508.27(b)(9).

The Navajo Nation Historic Preservation Department "concluded that the proposed undertaking of the land parcels that are within the Tres Rios Field office has a high potential to have adverse effects to traditional culture properties or places of cultural significance to the Navajo people." BLM06250.  This area is rich in "sites or other places listed or eligible for National Register of Historic Places or may cause destruction or loss to significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b)(8).  Yet, only "a small percentage (approximately 6%) of the proposed lease areas have been surveyed." BLM06250.  BLM

identifies that only 1,121 acres of the 16,945 acre leasing proposal was surveyed. BLM06476.

Yet, the survey identified important historic resources.

> Of the 11 sites recorded [in the lease tracts], three are eligible for listing on the NRPA, while seven sites are evaluated as needing more data, but must be protected as if they are eligible for listing.

*Id.* There is no cultural resources analysis in the Administrative Record. Although other laws require consultation with Tribes and Pueblos, Plaintiffs and their members' interests in historic and cultural resources are protected by NEPA. 40 C.F.R. § 1508.8. NEPA requires that "effects" that must be reviewed in a NEPA document include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.*

Although there is no NEPA analysis, the Administrative Record lists, with redaction, numerous sites ranging from 11,500 B.C. to 1750 A.D. that BLM has identified, but has not gathered the required data to confirm National Register of Historic Places eligibility. BLM05954-55. The lack of historic and cultural resource surveys in this area, combined with the serious impacts of oil and gas exploration, are significant enough to require an EIS and provides an independent basis to set aside the leases. *Oglala Sioux Tribe v. United States NRC*, 896 F.3d 520, 531 (D.C. Cir. 2018) (analyzing proper relief in light of agency finding that "the inadequate discussion of potential impacts to Sioux cultural, historical, or religious sites in the [EIS] or Record of Decision is *a significant deficiency* in the […] NEPA review.") (italics supplied by Court).

Taken individually, or cumulative, the factors requiring an EIS are easily met by this lease sale. If BLM had followed its own internal policies, an EA/FONSI may have been sufficient. However, the Administrative Record confirms that significant impacts exist that were

not given the "hard look" in either of the two tiers of the NEPA process that must be completed

before leases are issued. *Id.*; *Pennaco*, 377 F.3d at 1162. The lack of an EIS cannot be cured

post-lease analysis.  Once the leases issue, BLM interprets its regulations to preclude additional

lease-tier stipulations because a lease creates private rights through an irretrievable commitment

of federal resources. *Id*.

   NEPA requires BLM to take a "hard look" at the consequences a proposed project may

have on communities and the environment. *Citizens' Comm. to Save Our Canyons,* 513 F.3d at

1179 (10th Cir. 2008) *quoting Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.

1997).  This examination "must be taken objectively and in good faith" and the agency may not

engage in "subterfuge designed to rationalize a decision already made." *Wyoming*, 661 F.3d at

1263-64; 40 C.F.R. §§ 1502.2(g), 1502.5.  Even in circumstances where the potential impacts are

not "significant" and therefore do not require preparation of an EIS, the full agency action must

be analyzed in a NEPA document somewhere in the NEPA process before leases are issued. *San

Juan Citizens Alliance v. Stiles,* 654 F.3d 1038, 1055, (10th Cir. 2011) (approving planning-level

EIS where "further review will take place when the Lessees submit site-specific permit

applications.").

   Here, there has been no NEPA "hard look" at the decision to issue leases at these

locations, and if not addressed now, there will be no legal means to ensure BLM considers the

lease-tier options while those options remain viable.

  **C.**  **BLM Failed to Address its FLPMA Duty to Prevent Unnecessary and Undue
    Degradation**

   BLM has a substantive, non-discretionary duty to "take any action necessary to prevent

unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  This is a substantive duty,

which interacts with the Mineral Leasing Act provisions, NEPA's action-forcing procedures, and the ESA's consultation requirements. When interpreting FLPMA's statutory language, the deliberate use of the disjunctive "or" was confirmed, thereby requiring BLM to take "any action necessary to prevent unnecessary *or* undue degradation." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 43 (D.D.C. 2003) quoting 43 U.S.C. § 1732(b) (emphasis added by Court). BLM's resolution of the RMP protests promised evaluation of UUD.

> The unnecessary and undue degradation mandate under Section 302(b) of FLPMA cited by the protester is applied to all actions on public lands at the site specific level. Regardless of the proposed land use plan level actions articulated in the PRMP/FEIS, <u>all subsequent site specific actions on public lands will only be approved after an environmental review, which includes consideration of the unnecessary and undue degradation of a proposal.</u>

BLM11701 (emphasis supplied). BLM's RMP tier promise to comply with FLPMA later again rings hollow. The Administrative Record contains no site-specific analysis and nothing to suggest that degradation flowing from additional lease tracts, roads, and service infrastructure is necessary to extract the federal oil and gas in a field with numerous other producing wells.

BLM did not prepare any analysis of foreseeable degradation, and there is no NEPA analysis to address the FLPMA requirement that BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b) ("UUD"). This substantive duty to prevent UUD of public resources is "the heart of FLPMA." *MPC*, 292 F.Supp.2d at 42. BLM's UUD duty aligns with the heart of the NEPA process, which is the comparison of alternatives. *Greater Yellowstone Coal.*, 359 F.3d at 1277 (citation omitted).

Because UUD stems from FLPMA, BLM's requirement to prevent UUD applies to any BLM action, whether it is a proposed mine or proposed oil and gas leasing. *See* 43 U.S.C. § 1732(b). Accordingly, BLM has the authority and obligation to forego oil and gas leasing in

areas that would cause UUD. *See MPC*, 292 F. Supp.2d at 42.  By forcing BLM to develop

UUD-compliant roads, infrastructure, colocations, and other production alternatives early in the

NEPA process, early compliance with FLPMA and NEPA avoids "downstream delays"

associated with outright denial of proposals that the agency cannot approve. *Town of Superior v.*

*United States Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1113 (D. Colo. 2012) *citing* 40 C.F.R.

§ 1501.2.  BLM has interpreted its authority to prevent UUD to "prevent all UUD, including

UUD occasioning irreparable harm to scientific, cultural, or environmental resource values."

*MPC*, 292 F.Supp.2d at 44 (quoting BLM's brief to the court).  BLM exercises "case-by-case

discretion to protect the environment" and examine its UUD duties. *Id.*  BLM is required to use

NEPA to inform its case-by-case discretion and UUD duty to protect the environment when

deciding whether or not to issue leases in areas the RMP deemed open for federal fluid mineral

leasing.  *See Ctr. For Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 645 (9th Cir.

2010) *quoting MPC*, 292 F.Supp.2d at 44.

Costs imposed by stipulations and other lease restrictions are not determinative as to their

reasonableness, but must be examined carefully in light of competing interests.  "Whether a cost

is prohibitive depends on context, in particular regarding the value of productive use of the land

over time."  *Sch. Bd. of Avoyelles Parish v. United States DOI*, 647 F.3d 570, 585 (5th Cir. 2011)

a*ccord Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,* 630 F.3d 431, 434 (5th Cir.

2011).  Again, the lease-tier NEPA analysis is the place to address the alternatives, and the costs

required to avoid the unnecessary or undue degradation of public lands.

When BLM's FLPMA duties are considered in a NEPA process in light of its ESA

duties, the public and the decisionmakers will be made aware that "Congress intended

endangered species to be afforded the highest of priorities." *Tennessee Valley Auth. v. Hill*, 437

U.S. 153, 173-74 (1978).  The Administrative Record lacks any evidence that BLM even considered whether or not issuing leases is even necessary to extract the oil and gas, or whether the degradation associated with oil and gas development is warranted.  On this Record, BLM's uninformed decisionmaking has effectively afforded private oil and gas developers the highest of priorities, while pressuring a declining population of Gunnison sage-grouse closer to extirpation.

The integration of NEPA, ESA and FLPMA analysis at the leasing tier, particularly the no action alternative and lease stipulations, is critical for preventing UUD because comparison across a range of alternatives must inform BLM's leasing decisions.  To avoid an unlawful RMP, BLM promised that its UUD analysis would take place before each site specific decisions tier.

> The unnecessary and undue degradation mandate under Section 302(b) of FLPMA cited by the protester is applied to all actions on public lands at the site specific level. Regardless of the proposed land use plan level actions articulated in the PRMP/FEIS, all subsequent site specific actions on public lands will only be approved after an environmental review, which includes consideration of the unnecessary and undue degradation of a proposal.

BLM11701. BLM will likely promise to carry out UUD analysis for individual APDs, but as set out above, the duties must be met when they arise, and must match the scope of the actions being contemplated. *High Country Conservation Advocates v. United States Forest Serv*., 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014) ("It makes no sense for the agency to then turn around and 'tier' their analysis to an early analysis that never took place.").

### D.    BLM Did not Maintain an APA-Compliant Administrative Record.

Reviewing courts are not allowed to "supply a reasoned basis for the agency's action that the agency itself has not given" nor may the agency's briefing provide a *post hoc* rationalization that provides a reasoned basis not contained in the administrative record. *Motor Vehicle Mfrs*., 463 U.S. 29, 43 (1983), *quoting SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947).  Courts are

not allowed to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97 (1983) (internal quotation marks omitted).

Tenth Circuit precedent turns on the presumption that federal agencies maintain an Administrative Record should a decision be reviewed by a district court, much as a trial court keeps a record for review by a court of appeals. *Olenhouse,* 42 F.3d at 1576. The present case confirms that the "administrative record" is a mere fiction in the BLM decisionmaking process. Here, there is no evidence to suggest BLM kept an administrative record. See ECF No. 22-2 (Designation of the Administrative Record). Without some kind of proffer, such as a sworn declaration by the decisionmaker(s), there is basis to confirm whether or not the record consists of documents considered by the decisionmaker.[7] See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *Double J. Land & Cattle v. U.S. Dep't of the Interior*, 91 F.3d 1378, 1383 (10th Cir. 1996).

Here, there is no administrative record evidence to suggest BLM even considered the relevant legal factors. For example, the Decision Record (BLM11311-11314) and Determination of NEPA Adequacy (BLM-12225-11308) do not contain a BLM determination on whether or not leasing these ten parcels "may affect" the Gunnison sage-grouse. Therefore, there can be no administrative record of a "may affect" determination that BLM never made. The "may affect" inquiry is a question of fact linked to the specific lease tracts and leases that is presented for the first time in the district court to review on an evidentiary record created in the district court.

---

[7] Plaintiffs' brief relies on the Administrative Record and respectfully reasserts its position that the ESA claims are not restricted to BLM's administrative record.

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1221 (D. Colo. 2011) (considering extra-record declaration confirming affects where agency "did not arrive at a 'no effect' determination in the" NEPA documents). In the present case, the administrative record has been established, and the record contradicts BLM's non-decision on "may affect."

Plaintiffs submit they are able to prevail on the merits, because BLM's Administrative Record contains information that confirms the proposed lease sale "may affect" Gunnison sage-grouse, including letters FWS (BLM08632) and CPW (BLM06389, BLM08580) submitted to BLM requesting deferment of parcels based on the harm the proposed action could cause the local Gunnison sage-grouse population. To the extent the necessary procedures, including record maintenance, are followed on remand, BLM's failure to identify the actual administrative record it relied upon would constitute harmless error. However, Plaintiffs request the Court confirm that the procedures in *Olenhouse* and progeny, and district court's appellate-like review, could not have upheld the agency action because questions of administrative due process and fairness require agencies to create and maintain an administrative record that can be certified by the decisionmaker and transmitted to the reviewing court as a ministerial act, should the agency action be challenged. *Olenhouse*, 42 F.3d 1560 at 1576.

## V.    RELIEF

The District Court can remedy an environmental plaintiff's claim by vacating agency actions and declaring the leases void *ab initio*. 43 C.F.R. §3108.3(d). Vacatur is the presumed APA remedy. 5 U.S.C. § 706(2)(A) (directing reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971). Vacating agency action serves "NEPA's goals of

59

deliberative, non-arbitrary decision-making [that] would seem best served by [...] agencies approaching these actions with a clean slate." *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014) (vacating lease modifications). Entering findings and vacating the DNA, Decision Record, and leases provides full relief, because NEPA requires that, until an agency issues a Record of Decision for a pending NEPA document, "no action concerning the proposal shall be taken which would: (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2).  The purpose of NEPA documents is to ensure informed decisionmaking, but in responding to an angry surface owner impacted by these lease decisions, BLM "recognize[d] that our federal process is neither easy to understand, nor particularly transparent." BLM11139. By setting aside the leases and requiring BLM to prepare an EIS based on NEPA's action-forcing procedures, BLM's three-tiered leasing process should become understandable and transparent.

The ESA citizen suit provision (16 U.S.C. § 1540(g)) and the APA also allow the Court to exercise equitable discretion to enjoin all activities, including exploration, surveying, staking, drilling, and reclamation activities involving "any of the leases until they have fully complied with NEPA and ESA." *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) quoting *Conner v. Burford,* 848 F.2d 1441, 1460-61, 1462 (9th Cir. 1988) (staying leases until agencies on remand complied with NEPA and ESA).  However, departing from the presumptive remedy can inadvertently entangle the District Court in the matter for many years. *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 302 F. Supp. 3d 1251, 1254 (D. Colo. 2018) (finding partial compliance, and leaving 2011 injunction in place).

Here, setting aside the leases can cause no harm, because BLM issued the leases with the expectation the leases could be cancelled if BLM did not comply with federal law. 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued."). "This regulatory right of cancellation was designed to provide the Secretary of the Interior with flexibility in managing public lands and with the ability to correct the mistakes of his subordinates." *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 176 (2014) *citing Boesche v. Udall*, 373 U.S. 472, 478-79 (1963) (lease may be cancelled for legal violations or administrative errors committed prior to the issuance of the lease). The APA's judicial remedy - vacatur of the leases - is consistent with BLM's oil and gas leasing regulations.

No cognizable harm can flow from invalidating the leases, because each lessee was notified but did respond or otherwise seek to protect leases that BLM has defended vigorously in this litigation. ECF No. 37 at 1 FN1. Even if Rule 19 had been plead as a defense, which it was not (ECF No. 19 at 31), "if the defendant is capable of bringing into the litigation a nonparty whose presence is allegedly required to fully resolve the controversy and if that nonparty is otherwise capable of intervening, then the nonparty cannot be considered indispensable under Rule 19(b)." *Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1211 (10th Cir. 1997) citing *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496 (7th Cir. 1980).[8] Further, if BLM does not make its lessees whole, any potential contract claims involving cancellation, recessions, or other monetary claims the lessees may have against BLM must be brought, if at all, in the Court of Claims. *See Century Exploration New Orleans, Inc. v. United*

---

[8]BLM has represented its lessees' interests and has vigorously defended the leases. Alternatively, once liability is established, should the Court prefer to involve these lessees, additional proceedings concerning relief could be conducted.

*States*, 103 Fed. Cl. 70, 73 (Fed. Cl. 2012) (allowing mineral lease claims against U.S. to go forward).

Congress passed the Mineral Leasing Act of 1920 ("MLA") in response to mismanagement and abuse of oil and gas rights involving public lands and established a fluid mineral leasing program for federally owned oil and gas. 30 U.S.C. §§ 181 *et seq.* BLM's MLA activities are subordinate to the ESA, and Federal agencies have an affirmative duty to protect and help recover listed species. 16 U.S.C. § 1536(a)(1). Similarly, NEPA and FLPMA place substantive and procedural constraints on BLM's MLA discretion. This suit seeks to ensure these laws are faithfully executed, in the public interest, before BLM "acts to issue the lease." *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013). Until BLM issues a lease in compliance with federal law, "the applicant has only a 'hope or . . . expectation of a lease' and not a vested right." *Id*. *accord* 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued.").

Vacating the agency actions (DNA, Decision Record, and leases) and remanding with instructions serves statutory purposes, conserves judicial resources, and remedies Plaintiffs' claims without prejudicing any non-party.

## VI.    CONCLUSION

Plaintiffs respectfully submit that their claims are meritorious and respectfully request effective relief that includes findings of law, findings of fact confirming the Tres Rios Resource Management Plan did not address specific lease locations, setting aside the DNA, Decision Record and the challenged leases, and confirmation that BLM may issue leases in the Tres Rios Resource Management Area, if at all, consistent with the Court's findings of law and fact.

**RESPECTFULLY SUBMITTED this 9th Day of November 2018,**

s/ Travis E. Stills
**Travis E. Stills**
Energy & Conservation Law
1911 Main Ave., Suite 238
Durango, Colorado 81301
(970) 375-9231
stills@frontier.net

**Matthew Sandler**
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
303-579-5162
Matt@rockymountainwild.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2018 I served a copy of this document on all parties using the CM/ECF system.

*/s Travis E. Stills*
Travis E. Stills